I concur in the Court's order vacating the Commonwealth Court's order and remanding for the reasons set forth in my concurring opinion in *Commonwealth v. TAP Pharm. Prods. Inc.,* —— Pa. ——, 94 A.3d 350, 2014 WL 2723008 (Pa.2014) (Baer, J. concurring)(indicating my view that a remand is warranted for further consideration of the case in light of the OAJC's analysis of the rebate issue).

Justices TODD and McCAFFERY join this concurring statement.

**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Roland A. SPOTTI, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 19, 2013.

Filed June 5, 2014.

Warren–Boulton conceded as follows in an interchange with counsel:

Q. [W]ould you agree that these rebates lower the net cost of each drug that is dispensed and reimbursed by DPW and PACE?

A. Holding constant other payments by DPW and PACE, of course, yes. . . .

N.T., November 3, 2010, at 2435.

Paul D. Boas, Pittsburgh, for appellant.

Amy E. Constantine, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: BENDER, P.J., FORD ELLIOTT, P.J.E., BOWES, J., GANTMAN, J., DONOHUE, J., ALLEN, J., LAZARUS, J., OTT, J., and WECHT, J.

OPINION BY ALLEN, J.:

Roland A. Spotti, Jr., ("Appellant") appeals from the aggregate judgment of sentence of 2–4 years' incarceration, which was imposed following his convictions by a jury trial of four counts of aggravated assault by vehicle while driving under the influence of alcohol (AA–DUI), 75 Pa.C.S. § 3735.1, and related offenses.[1] We affirm.

This matter involves an April 16, 2008 accident on State Route 376 East, a four-lane highway near Robinson Township, Allegheny County. At 9:30 p.m. that evening, emergency services received multiple reports that Appellant's vehicle was driving erratically. One witness, Elise Blackwell, was advised by emergency services to follow Appellant with her hazard lights flashing in order to assist law enforcement in identifying Appellant's vehicle. Ms. Blackwell complied. Meanwhile, another motorist, Steven Chung, also contacted emergency services.

Responding State Trooper Thomas W. Armour was able to locate Appellant's vehicle once he observed Ms. Blackwell's hazard lights. Trooper Armour pursued Appellant's vehicle in the left lane with his siren and lights activated. Trooper Armour observed Appellant's vehicle repeatedly swerve into the right lane of traffic, where Mr. Chung and his sister were traveling. During a swerve into the right lane, Appellant braked suddenly, causing Mr. Chung to veer right in order to avoid colliding with Appellant's vehicle. Mr. Chung then collided with a disabled van which was on the side of the road, which in turn struck a tow truck that was there assisting the disabled van. Richard Benchoff and Eric Hamilton were severely injured as they were changing a tire on the van. Mr. Chung and his passenger, Susan Chung, were also injured.

Appellant, who later claimed to be unaware that the accident had occurred, continued to drive until Trooper Armour pulled him over. Appellant was transported to Ohio Valley Hospital where his blood was drawn. The blood was tested by the Allegheny County Crime Lab, which determined that Appellant's blood alcohol content ("BAC") was 0.203, significantly above the legal limit for adults.

At the time of the incident, Appellant was two months shy of his eighteenth birthday, and thus this case was initially brought before the Juvenile Section of the Family Division, Court of Common Pleas of Allegheny County. The Commonwealth filed to transfer the proceedings from juvenile to adult court, and a hearing on the matter was held on July 16, 2009. Following that hearing, the court granted the Commonwealth's motion and certified Appellant's case to the Criminal Division.

The matter proceeded to a jury trial, and on December 6, 2010, Appellant was convicted of the aforementioned charges. Appellant was sentenced to an aggregate term of 2–4 years' incarceration. Appel-

---

1. Appellant was also convicted of two counts of driving under the influence of alcohol or a controlled substance ("DUI"), 75 Pa.C.S. § 3802(c) and (e); reckless driving, 75 Pa. C.S. § 3736; careless driving, 75 Pa.C.S. § 3714; minor prohibited from operating with any alcohol in system, 75 Pa.C.S. § 3718; and purchase, consumption, possession or transportation of liquor or malt or brewed beverages, 18 Pa.C.S. § 6308.

lant filed timely post-sentence motions which were denied by the trial court on March 28, 2011. Appellant filed a timely notice of appeal with this Court, and then filed a timely concise statement in compliance with Pa.R.A.P. 1925(b). On September 16, 2011, the trial court filed its Pa. R.A.P. 1925(a) opinion.

Appellant presents the following issues on appeal:

I.   Whether the Juvenile Court erred in transferring the case to Criminal Court by failing to properly follow the statutory provisions and errantly determining reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution?

II.  Whether the lower court erred in denying [Appellant's] motion for judgment of acquittal regarding the four [AA–DUI] counts based on the intervening reckless acts of Mr. Chung?

III. Whether the Commonwealth failed to prove as a matter of law that the injuries to Steven Chung and Susan Chung constituted serious[ ] bodily injury which is necessary for [AA–DUI]?

IV.  Whether the destruction of the video tape of [Appellant's] driving on the night in question constituted a violation of the United States Supreme Court decision of *Brady v. Maryland*?

Appellant's Brief at 3.

In an opinion filed on April 12, 2013, a divided panel of this court affirmed in part and reversed in part. Both the majority and the dissent agreed with respect to Appellant's first and fourth claims that the juvenile court did not err by certifying that Appellant be tried as an adult in criminal court, and that the destruction of the video tape did not constitute a *Brady* violation.

However, with respect to his second claim, the majority opinion reversed Appellant's AA–DUI convictions, concluding that the Commonwealth had failed to establish sufficient evidence of causation. Consequently, the majority did not reach Appellant's third claim, as it had been rendered moot by the reversal of the AA–DUI convictions.

The Commonwealth filed an application for *en banc* reargument on April 26, 2013. The Commonwealth argued that the panel's majority had erred in distinguishing between criminal and civil standards of causation when it reversed Appellant's AA–DUI convictions, largely reflecting the opinion of the dissent. By *per curiam* order dated June 12, 2013, this Court granted reargument and withdrew the panel opinion.

### Adult Certification

We first consider whether the juvenile court erred by certifying this case to be tried in criminal court. Our standard of review is as follows:

> [T]he "ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of a juvenile court." An appellate court may not disturb a certification ruling unless the juvenile court committed an abuse of discretion. The existence of facts in the record that would support a contrary result does not demonstrate an abuse of discretion. Rather, "the court rendering the adult certification decision must have misapplied the law, exercised unreasonable judgment, or based its decision on ill will, bias, or prejudice."

*Commonwealth v. In re E.F.*, 606 Pa. 73, 995 A.2d 326, 329 (2010) (internal footnotes and citations omitted).

The Juvenile Act permits the transfer of a juvenile case to adult criminal court if

there is a *"prima facie* case that the child committed the delinquent act alleged, the delinquent act would be considered a felony if committed by an adult, and if there are reasonable grounds to believe that the public interest would be served by the transfer of the case for criminal prosecution." *Id.* (citing 42 Pa.C.S. § 6355(a)(4)(i)-(iii)). When a court assesses whether the public interest is served by the transfer, the Juvenile Act requires that the court consider the following factors:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors....

42 Pa.C.S. § 6355(a)(4)(iii).

██ "[T]he Juvenile Act places the burden of proof upon the Commonwealth to establish, by a preponderance of the evidence, that the public interest is served by the transfer of the case ... and that a child is not amenable to treatment, supervision, or rehabilitation as a juvenile." *In re E.F.*, 995 A.2d at 330.

At the certification hearing, Trooper Armour testified regarding the nature and circumstances of the threat to safety posed by Appellant's intoxicated, erratic driving on April 16, 2008. N.T., 7/16/09, at 3–16. Victims Mr. Benchoff and Mr. Hamilton, along with their wives, testified about the impact of the incident on their lives, including the severe physical, emotional, and financial consequences arising from their injuries. *Id.* at 29–32, 33–39, 52–59, and 59–63. Candise Kovalchuk, Appellant's probation officer, testified to Appellant's lengthy involvement with the juvenile court system, which began when Appellant was 13 years old.[2] *Id.* at 41–48. The Commonwealth argued that Appellant's

---

**2.** Appellant's prior juvenile record includes a 2008 consent decree for two cases, one of which was an accident involving a DUI where Appellant was found to have a BAC of .153. N.T., 7/16/09, 42–44. For both offenses, Appellant received a six-month license suspension and was ordered to undergo intensive drug and alcohol treatment. *Id.* at 44–45. Following his completion of inpatient and outpatient drug and alcohol treatment, Appel-

lant's case was closed in September of 2008. *Id.* at 45. However, after the instant case was initiated in juvenile court, Appellant was charged on nine separate occasions in magistrate's court. *Id.* at 45–47. Several charges were alcohol-related, including citations for underage drinking in local bars, to which Appellant pled guilty to a lesser offense of disorderly conduct. *Id.*

drunken driving posed a serious risk to the public. *Id.* at 71. It also argued that, due to Appellant's age, the adequacy and duration of available dispositional alternatives in the juvenile system were limited. *Id.* at 71–72.

Following the certification hearing, the juvenile court made the following statement on the record:

> Your actions speak louder than your words, they really do. When you continue to drink—when, first of all, you are not even of legal age to do so—it just shows that person doesn't get it.
>
> We are talking about a stone cold problem here, aren't we? This is not something I can deal with in two years. [Appellant] is obviously an alcoholic. There is no doubt in my mind.
>
> Like [the district attorney] stated, when you have crippled two people and you can't quit drinking, you've got yourself a problem that is going to be with you the rest of your life. I'm sorry, I can't supervise you for the rest of your life. I can't do it. I have until he is 21. Not to mention the factors of public safety and impact on the victims.
>
> \*     \*     \*
>
> I will note for the record that at the time this offense happened he was two months shy of being 18. I mean, he was making adult decisions. As far as I'm concerned, putting a drink to your lips is an adult decision, so I think you should be treated like an adult. They certainly are better capable of addressing what are going to be, as far as I am concerned, lifetime issues.

> So based on the stipulation to the *prima facie* case, as well as the records stated, records admitted, evidence admitted, I am going to grant the Commonwealth's motion, and I am going to certify the case to the adult criminal division.

*Id.* at 74, 76.

The juvenile court then issued an order making the following findings:

> The Commonwealth has established a *prima facie* case for [the aforementioned charges].
>
> The Commonwealth has established, by a preponderance of the evidence, that the public interest is served by the transfer of the case to criminal proceedings.
>
> The Commonwealth has established, by a preponderance of the evidence, that the juvenile is not amenable to treatment, supervision[,] or rehabilitation as a juvenile.
>
> The minor has failed to establish, by a preponderance of the evidence, that retaining the case in [the juvenile division] serves the public interest.
>
> The minor has failed to establish, by a preponderance of the evidence, that he is amenable to treatment, supervision[,] or rehabilitation as a juvenile.

Certification Order—Transfer to Criminal Proceedings, 7/16/09.

Appellant contends that the juvenile court abused its discretion when it failed to properly apply the factors set forth in 42 Pa.C.S. § 6355(a)(4)(iii). Appellant argues the court abused its discretion in two respects: first, that the court failed to consider certain required factors under the statute [3] and, second, that the court misapplied the factors that it did consider.[4] Ap-

---

**3.** Appellant contends that the juvenile court primarily focused on the victim impact testimony and Appellant's prior delinquent history to the exclusion of the other factors set forth in 42 Pa.C.S. § 6355(a)(4)(iii).

**4.** Appellant argues the juvenile court misapplied the law by explicitly failing to address whether the transfer to criminal proceedings served the public interest, as the court erroneously stated at the hearing that it only had to

pellant's Brief at 14, 16. Additionally, Appellant insists that even if the juvenile court "properly followed the statutory rubric[,]" its decision to transfer was still an abuse of discretion because it was "unreasonable ... given the facts of this case." *Id.* at 17. We disagree.

> Although the Juvenile Act requires that a decertification court consider all of the amenability factors, it is silent as to the weight that should be assessed to each factor. *See Commonwealth v. Jackson,* 555 Pa. 37, 45, 722 A.2d 1030, 1033 (1999). The ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of a decertification court. *See id.,* 555 Pa. at 45, 722 A.2d at 1034. A decertification court must consider all the facts set forth in § 6355 of the Juvenile Act, but it need not address, seriatim, the applicability and importance of each factor and fact in reaching its final determination. *See id.*

*Commonwealth v. Ruffin,* 10 A.3d 336, 339 (Pa.Super.2010).

■ Our review of the record reflects that the Commonwealth presented ample evidence to support the juvenile court's decision to certify the case to the criminal division. While the juvenile court did not explicitly address certain factors enumerated in 42 Pa.C.S. § 6355(a)(4)(iii) at the hearing, such a scenario does not automatically render the juvenile court's decision an abuse of discretion, particularly when the record contains adequate facts supporting the juvenile court's ruling. *See Jackson,* 722 A.2d at 1034 ("The presumption in this Commonwealth remains that if a court has facts in its possession, it will apply them[,]" and "[w]hen evaluating the propriety of a certification decision, absent evidence to the contrary, a reviewing court

consider Appellant's amenability to treatment.

must presume that the juvenile court carefully considered the entire record.").

The juvenile court opined that the public interest was served by transferring Appellant's case to criminal court because of 1) the severity of the impact on the victims; 2) the "fear, concern[,] and inconvenience of the motorists exposed to the scene of this gruesome accident[;]" 3) Appellant's repeated history of DUIs where accidents resulted; and 4) the limited dispositional alternatives available in the juvenile court, as Appellant was already 19 years old at the time of the hearing. Juvenile Court Opinion, 12/15/11, at 5–9.

Appellant complains that the juvenile court engaged in an *ad hoc* analysis, and that the juvenile court's statements during the hearing indicated that it had not considered the public interest. However, all of the factors cited in the juvenile court's opinion derive from evidence produced at the hearing, and are the statutorily required factors in determining if Appellant's certification was in the public's interest. *See* 42 Pa.C.S. § 6355(a)(4)(iii). Thus, the record shows that the juvenile court did hear sufficient evidence to support a finding that certification was in the public interest. Further, the juvenile court specifically determined in its certification order that the Commonwealth had established, by a preponderance of the evidence, that the public interest was served by the transfer. Accordingly, we hold that the juvenile court did not misapply the factors set forth in § 6355(a)(4)(iii).

We further disagree with Appellant's contention that the juvenile court exercised unreasonable judgment in transferring Appellant's case to criminal proceedings. Appellant complains that the juvenile court conflated the issues of the impact of the offense on the community

N.T., 7/16/09, at 73.

and the impact of the offense on the victims. Appellant further argues that "the fact that individuals may have been inconvenienced by the accident on the road may have a small impact on the community; however, that alone should not weigh significantly in a Court's mind when it determined whether to transfer a case to criminal court." Appellant's Brief at 19. However, the impact on the community is not completely disconnected from the impact on specific victims. Moreover, 42 Pa.C.S. § 6355(a)(4)(iii) provides that *both* factors are relevant. Appellant's interpretation would necessarily prioritize the impact on the community when considering whether a transfer is in the public interest, whereas the statute itself sets forth no hierarchy between the factors, thereby allowing the juvenile court to consider the propriety of certification on a case by case basis. Here, the juvenile court expressly determined that the impact of the offense on the victims was a predominant factor. The juvenile court further considered Appellant's prior juvenile record and his lack of amenability to treatment, *in addition to* the impact of the offense on the community. There was nothing manifestly unreasonable about the juvenile court's determination to transfer Appellant's case. *In re E.F.*, 995 A.2d at 329 (To constitute an abuse of discretion, "the court rendering the adult certification decision must have misapplied the law, exercised unreasonable judgment, or based its decision on ill will, bias, or prejudice.").

Appellant argued against transfer by noting that he did not intend to inflict the injuries that resulted, that his alcohol abuse limited both his level of maturity and mental capacity, and that the crimes lacked any degree of sophistication. Appellant further argued that there was no basis for the court to conclude that two years was an insufficient amount of time for the juvenile system to successfully provide for his treatment and rehabilitation. Appellant's arguments are unavailing. "The existence of facts in the record that would support a contrary result does not demonstrate an abuse of discretion." *Id.* Accordingly, we conclude that Appellant has failed to demonstrate that the juvenile court abused its discretion in transferring his case to criminal court.

### Sufficiency of Causation

We next consider Appellant's claim that the trial court erred in denying his motion for judgment of acquittal directed at the AA–DUI charges. Appellant contends that his convictions for AA–DUI must be overturned because Mr. Chung's actions were a sufficiently independent cause of the accident, which broke the chain of legal causation required to support Appellant's convictions under the AA–DUI statute. We disagree.

We are mandated to frame our sufficiency review of Appellant's AA–DUI convictions by viewing "all the evidence admitted at trial in the light most favorable to the verdict winner," to determine whether "there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Nunn*, 947 A.2d 756, 759 (Pa.Super.2008) (internal citations omitted). "We may not weigh the evidence and substitute our judgment for the fact-finder ... [ ] [who] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Id.*

The offense of AA–DUI is defined as follows.

> Any person who negligently causes serious bodily injury to another person as the result of a violation of section 3802

(relating to driving under influence of alcohol or controlled substance) and who is convicted of violating section 3802 commits a felony of the second degree when the violation is the cause of the injury.

75 Pa.C.S. § 3735.1.

Additionally, the following definitions are germane to our analysis:

(a) **General rule.**—Conduct is the cause of a result when:

(1) it is an antecedent but for which the result in question would not have occurred; and

(2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.

\*   \*   \*

(c) **Divergence between probable and actual result.**—When recklessly or negligently causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of negligence, of which he should be aware unless:

(1) the actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or

(2) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a bearing on the liability of the actor or on the gravity of his offense.

18 Pa.C.S. § 303(a); (c).

In *Nunn,* we reiterated:

To establish criminal causation, the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability. *Commonwealth v. Long,* 425 Pa.Super. 170, 624 A.2d 200, 203–204 (1993), *appeal denied,* 535 Pa. 645, 633 A.2d 150 (1993) (*citing Commonwealth v. Rementer,* 410 Pa.Super. 9, 598 A.2d 1300, 1304 (1991), *appeal denied,* 533 Pa. 599, 617 A.2d 1273 (1992)).

In *Rementer,* we set forth a two-part test for determining criminal causation. First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. *Rementer,* 598 A.2d at 1305; 18 Pa. C.S.A. § 303(a)(1). A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." *Rementer,* 598 A.2d at 1305, n. 3 (*quoting* LaFave and Scott, *Substantive Criminal Law,* Vol. 1, Ch. 3., at 391–392 (1986)). Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible. *Rementer,* 598 A.2d at 1305.

As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. *Rementer,* 598 A.2d at 1305. "Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." *Long,* 624 A.2d at 203 (*citing Commonwealth v. Skufca,* 457 Pa. 124, 321 A.2d 889 (1974), *appeal dismissed,* 419 U.S. 1028, 95 S.Ct. 510, 42 L.Ed.2d 304 (1974)). The second part of

the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. *Id.* (citing *Rementer* and *Commonwealth v. Paquette,* 451 Pa. 250, 301 A.2d 837 (1973)). "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt." *Id.* at 204, 624 A.2d 200 (*citing Rementer,* 598 A.2d at 1306–1307).

*Nunn,* 947 A.2d at 760.

Recently, in *Commonwealth v. Fabian,* 60 A.3d 146 (Pa.Super.2013), we expressed:

> In seeking to define the requirement that a criminal defendant's conduct be a direct factor in the death of another, the courts of this Commonwealth have held that 'so long as the defendant's conduct started the chain of causation which led to the victim's death, criminal responsibility ... may be properly found.'

*Fabian, supra,* at 152 *citing Commonwealth v. McCloskey,* 835 A.2d 801, 808 (Pa.Super.2003).

■ Appellant contends that he cannot be criminally charged with AA–DUI for the accident and related injuries in this case. To support his contention, Appellant argues:

> At no point in the evening in question did [Appellant's] vehicle collide or even make contact with another vehicle. Instead, it was Mr. Chung who swerved off the highway colliding with the parked vehicles that he was unaware were present until he drove into them. That evening, Mr. Chung made a conscious decision to engage in behavior so reckless, unwarranted, and unforeseeable, that the consequences of those actions cannot be attributed to [Appellant]. [ ]
>
> Unfortunately, Mr. Chung was more interested in fulfilling his law enforcement fantasy than avoiding danger. [ ] Mr. Chung decided to bring his vehicle dangerously close and chase [Appellant] at fifty (50) miles per hour. [ ]
>
> [ ] Had Mr. Chung been less enthusiastic about pretending to be a police officer, and more enthusiastic about public safety, the tragic consequences of his reckless behavior could have been avoided.

Appellant's Brief at 24–25 (citations to the record omitted). Our careful scrutiny of the trial testimony in this case, including the testimony from Appellant himself, belies all of Appellant's contentions, and reflects that such arguments were not even presented to the jury.

Instantly, Mr. Chung testified that he was driving his sister from the airport to the Marriott Hotel in downtown Pittsburgh. N.T., 12/3/10, at 109. During his drive, he "observed [Appellant's truck] swerving on the highway." *Id.* at 109–110. Mr. Chung further testified that "[a]s the vehicle was traveling, he was in front of us, and ... he was swerving all over what we call the center line and also to the median, the barrier[.]" *Id.* at 110. Mr. Chung explained "[a]nd then what caught my eye was, the moment that it almost hit a car causing another car to go to the right and he continued on the center line and on the—almost hitting the median on the left side." *Id.* Mr. Chung and his sister called 911 and "[w]hile [Mr. Chung] [was] on the phone with the police," Trooper Armour arrived. *Id.* at 110–111. When he saw police lights during his 911 call, Mr. Chung "began to yield to the right." *Id.* at 111. As he did so, "[Appellant's truck] went in front of me ..., jammed on his brakes, and I had to continue right. My option was either to hit him or just continue going right." *Id.* at 112. Mr. Chung had been traveling "with the flow of traffic and

slowing down, and I believe other vehicles were slowing down, because I remember the police car had its lights on." *Id.* at 113. Mr. Chung testified that to avoid striking Appellant's truck he had to take "immediate action." *Id.* at 114.

Mr. Chung never expressed that he was in any way seeking to act like a vigilante civilian law enforcer. Indeed, he sought aid from law enforcement, and yielded to the police once they joined the traffic pattern. There is not a single reference in Mr. Chung's testimony that he ever chased Appellant.

During cross-examination, Mr. Chung testified that he observed Appellant swerve "several times[.]" *Id.* at 129. Mr. Chung further testified that "[t]here actually were" cars "behind [Mr. Chung] or in front of him" as he observed Appellant swerve. *Id.* at 130. Mr. Chung stated that "from the time [he] observed the swerving," Appellant's vehicle never "got out of his sight," and both Mr. Chung and Appellant were traveling "in the left lane." *Id.* When asked "how far ahead or behind you was [Appellant's truck?]," Mr. Chung testified, "as far as distance-wise … it was ahead of me. There was some other traffic, too, that was there. But distance-wise, I can't give you an answer on that." *Id.* at 131. The accident in the berm area happened "instantaneously" after Mr. Chung took evasive action. *Id.* at 135–136. Clearly, Mr. Chung was not seeking to gain proximity to Appellant's erratic vehicle, which was among a pool of cars.

Ms. Blackwell corroborated Mr. Chung's testimony. Ms. Blackwell testified that she was driving on State Route 22/30 with two passengers, and heading into Robinson, when she observed Appellant's "truck with bright lights behind me swerving back and forth." *Id.* at 20. Ms. Blackwell described "whenever [Appellant's] truck passed, [it] nearly pushed us off, like drove us off the road, that we actually had to cross over the white line of the highway, and he was just swerving back and forth in between cars." *Id.* Ms. Blackwell further testified that as Appellant passed, she could "see that, ahead of me, with the cars, that he almost ran them off the road and hit them as well." *Id.* Ms. Blackwell explained that she "called 911 in the fear that … someone could get hurt because it was—it was a close call with me and the cars that I [had] seen in front of me as well." *Id.* The 911 dispatcher advised Ms. Blackwell that "the state trooper just got on the highway." *Id.* at 22. Ms. Blackwell testified "about, possibly five seconds after the cop had passed me, maybe ten seconds, I [saw] a cloud of smoke and I [saw] a guy rolling in the dirt." *Id.* Ms. Blackwell's testimony shows that Appellant, rather than Mr. Chung, was placing himself erratically in the flow of traffic, endangering other motorists, and causing multiple drivers to take evasive measures.

Trooper Armour also substantiated Mr. Chung's testimony. Trooper Armour testified that he received Ms. Blackwell's 911 call and immediately headed to the scene. *Id.* at 32. As he approached Ms. Blackwell's car, Trooper Armour saw "[Ms. Blackwell's] flashers … [Ms. Blackwell] gave me a visual of where to look, and I could see up ahead … a larger vehicle that is swerving from the left lane onto the berm, across the left lane, into—partially into the right lane, numerous times back and forth …" *Id.* at 34.

Trooper Armour further described "[w]hen I g[ot] within close proximity of being able to identify [Appellant's truck], there's cars between us. I noticed [Appellant's truck], which is in the left lane. Then it was the Ford Explorer being dr[iven] by Mr. Chung in the right lane." *Id.* at 37–38. Trooper Armour testified "[Appellant's truck] is swerving hard left,

right, outside of its lane of travel numerous times. Swerves hard right into the right lane." *Id.* at 38. Trooper Armour explained "[w]hat I mean by hard right is, Mr. Chung's vehicle, which is in the right lane[.]" *Id.* Trooper Armour testified "[a]s the vehicle comes over, Mr. Chung's immediate reaction was, he hits the brake and he swerves hard right ... causing Mr. Chung to drive into [the] berm area" where Mr. Chung struck another vehicle. *Id.* at 40–41. When asked to describe Appellant's swerving maneuvers, Trooper Armour described them as "large swerves ... very large," that spanned from "[w]ithin half a vehicle length to the right, and at least a quarter of the fog line to the left lane." *Id.* at 46.

During cross-examination, Trooper Armour testified about his observations of Appellant's truck from "the time [he] first saw [Appellant's truck] until [he] stopped it[.]" *Id.* at 66. During that time, Appellant's truck swerved "numerous" times "across the lanes" of traffic. *Id.* Trooper Armour testified that he "wasn't behind [Appellant] at the first swerve. When I first saw him, there were a couple of cars in between us, and you could see **'cause the ·other cars were maintaining their lane.'** They weren't swerving out [of] their lane of travel." *Id.* at 67 (emphasis supplied). Trooper Armour explained "[a]nd the way I was able to tell that was because **[Appellant's] vehicle, with the taillights, was going past their—their vehicles, and then past their vehicles on the other side of the roadway.**" *Id.* (emphasis supplied). Trooper Armour testified "I counted [Appellant] swerving one—back and forth—one, two, three, four; one motion ... [i]t wasn't like [Appellant] swerved and then stopped. It was continual. [Appellant's] truck was all over the road." *Id.*

Trooper Armour was asked "where was the other traffic" while Appellant swerved, and he answered "couple of cars behind [Appellant], couple of cars to the right." *Id.* at 68. Trooper Armour was further asked if he knew "for how long a period of time Mr. Chung's vehicle would have been in the proximity to [Appellant's vehicle] before [Trooper Armour] saw the first crash." *Id.* at 71. Trooper Armour testified that **Mr. Chung "[w]as stabilized in the right lane,** and then when [Appellant's truck] swerved into his path, [Mr. Chung] swerved off the roadway." *Id.* (emphasis supplied). During redirect, Trooper Armour testified that when Appellant "veered into Mr. Chung's lane," Mr. Chung's "options were to cause a traffic crash right into [Appellant], or avoid a crash, and [Mr. Chung] attempted to avoid a crash." *Id.* at 90.

One of the victims, Eric Hamilton, described how leading up to the crash, "the first thing I heard was the siren ... [s]econd thing I heard was tires squealing. And then I seen light through the van ... I seen headlights coming around the van or through the van ... [n]ext thing I know, we were flying through the air." N.T., 12/6/10, at 182. Mr. Hamilton "heard sirens and saw light," within "moments ... it had to be seconds" before the collision. *Id.*

Significantly, Appellant's testimony on direct examination did not establish that Mr. Chung was deliberately driving close to Appellant's vehicle. *See id.* at 242–252. Appellant never complained of Mr. Chung's car tailgating him. *Id.* Indeed, Appellant denied "notic[ing] [Mr. Chung's or any of the other accident vehicles] at any time that night[.]" *Id.* at 247. Rather, the only vehicle Appellant noticed and complained of tailgating him was Trooper Armour's patrol vehicle leading up to the traffic stop. *Id.* at 245–248; 251. Appel-

lant reiterated this observation when he testified that he "did not" "notice any car behind [Appellant] besides the police officer's car[.]" *Id.* at 251. Appellant repeatedly denied even seeing Mr. Chung the night of the accident. *Id.* Appellant testified he had "no clue" as to "where Mr. Chung would have been on the highway in relationship to [Appellant] and the police car[.]" *Id.* at 251–252. Appellant explained that as he "was driving down the road … [w]e got to right about the Ridge Road exit [near where the collision occurred], and traffic started to get real heavy, which it normally does there. It gets real heavy in front of the exit." *Id.* at 245.

During cross-examination, Appellant denied swerving on the roadway, and qualified his testimony with "[i]f I was swerving, coming half my vehicle into [Mr. Chung's] lane, I would have easily hit that vehicle—either I'd have hit him or he'd have hit me. It's gonna happen; it had to happen." *Id.* at 256. Significantly, the only reason a crash between Appellant and Mr. Chung did not occur was due to Mr. Chung's quick and evasive action, similar to the actions of other drivers on that road that night. The critical difference was the area into which Mr. Chung drove was the berm with the disabled van. The collision and related injuries were the direct and substantial result of Appellant's erratic drunken driving.

It is noteworthy that during closing arguments, Appellant's counsel *never* argued that Mr. Chung behaved as a rogue law enforcer, nor that Mr. Chung chased Appellant. *See generally id.* at 275–285. In fact, Appellant's counsel's argument to the jury regarding Mr. Chung's behavior concerned where Mr. Chung turned during his evasive maneuver, and his speed in a construction zone. Specifically, Appellant's counsel's argument regarding Mr.

Chung's role as an intervening cause was as follows:

We heard Mr. Chung's testimony that [Appellant], that he is coming this way (indicating) and [Mr. Chung is] behind [Appellant], and [Appellant] kept going and came to—either jammed on his brakes or [Appellant] swerved.

And Mr. Chung's back here somewhere (indicating). [Mr. Chung] decides that he is going to turn where the gore is, and at least 21 feet from where the gore began, [Mr. Chung] drives into the first of these three vehicles which we've heard about.

Now, [Appellant] went straight. [Appellant] did not make the turn in front of Mr. Chung, and [Appellant] kept going straight.

\*　　\*　　\*

The additional or what I would call intervening cause or cause that breaks the chain is the actual Mr. Chung, himself. Mr. Chung, we heard no testimony that Mr. Chung could not have come down this ramp without going [towards the gore] (indicating). We heard no testimony of that. This is the choice that Mr. Chung made; not [Appellant] or anybody else, but Mr. Chung.

And [Mr. Chung] decided he was going to go towards the gore and almost in a straight line, strike this vehicle, which struck this vehicle (indicating). And nobody testified that [Mr. Chung] couldn't have bore to the right and just kept going.

So, what I'm telling you or what I'm telling you is our version of what happened is that Mr. Chung made a choice. [ ]

So Mr. Chung made a choice. He could have gone down the ramp. We didn't hear him say that. We didn't hear anybody say that. [Mr. Chung]

decided he was going to go towards the gore, and obviously a collision took place after that.

\* \* \*

So you have to decide that, 1, that [Appellant], if you are to find him guilty beyond a reasonable doubt, you have to decide, Number 1, [Appellant] set into motion a chain of events which led up to the accident without any intervening cause, and I'm submitting to you that there is an intervening cause, and that is the accident of Mr. Chung. He had another way to go. Did he choose that? He chose the way that he saw these vehicles lined up over there, and he was driving 50 miles an hour in a construction zone. 50 miles an hour.

Now, to the fact that it was probably—that he was going through a construction zone, that, itself, can be an intervening cause which could break the chain of events that the Commonwealth is alleging that [Appellant] set into action.

\* \* \*

In any event, there are at least two intervening causes here. 1, Mr. Chung; and the second one is, well, Mr. Chung in both instances; one that he was—he could have taken another path to avoid this accident. He didn't. And number 2, he was driving 50 miles an hour, and he's the one that started the chain of events.

\* \* \*

[Trooper Armour] said that he saw [Appellant swerving on the highway]. [Trooper Armour] said that [Appellant] swerved. Mr. Chung said that [Appellant] jammed on his brakes, [Mr. Chung] is going 50 miles an hour and he has to slam on his brakes to stop. Isn't he going too fast. Especially if he runs into another vehicle, and especially in that area where there's a gore, where there's road construction. Was Mr. Chung a cause of the accident?

*Id.* at 278–281; 284.

Appellant's counsel argued to the jury that "the Commonwealth must prove beyond a reasonable doubt in order for [Appellant] to be found guilty of aggravated assault four times ... that [Appellant] caused this accident and ... that he started the chain which led up to the accident, and that there was no supervening or intervening cause." *Id.* at 277. Clearly, the jury found that Mr. Chung was not a supervening or intervening cause and rejected Appellant's lack of causation arguments based on the evidence adduced at trial as delineated above.

Thus, viewing all the evidence in the light most favorable to the Commonwealth as verdict-winner, we find that there was sufficient evidence to support Appellant's convictions for AA–DUI. Therefore, we affirm the judgment of sentence. Our affirmance recognizes that but for Appellant's drunken and erratic driving, Mr. Chung would not have been required to take evasive action, toward any location, and that the collision and related injuries were indeed a natural and foreseeable consequence of Appellant's actions. *See* 75 Pa.C.S. § 3735.1; *see also* 18 Pa.C.S. § 303; *Nunn, supra,* at 759–760; *Fabian, supra,* at 152; *McCloskey, supra,* at 808.

### Sufficiency of Evidence of Serious Bodily Injury

■ Appellant's third issue challenges the sufficiency of the evidence regarding whether Steven and Susan Chung suffered serious bodily injury as required by 75 Pa.C.S. § 3735.1.

Serious bodily injury is defined as "any bodily injury which creates a substantial risk of death or which causes serious, per-

manent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 75 Pa.C.S. § 3735.1(b).[5] Mr. Chung testified that the airbags in his vehicle deployed on impact, and he felt pain in his neck, chest, left knee, and wrists following the accident. N.T., 12/3/10, at 118. He testified that he and Ms. Chung were "backboarded" to a local hospital. *Id.* at 119–120. After Mr. Chung's release from the hospital, his injuries "got worse." *Id.* at 120. Mr. Chung explained that he "had neck strain, issues with [his] wrist and [is] going through physical therapy." *Id.* Mr. Chung further testified that "at some point during the treatment process, [he] also had an elbow pain in [his] right arm, and as a result of the accident or impact of something that occurred, developed a bone infection in my right arm." *Id.* at 120–121. To treat the infection, Mr. Chung underwent surgery to remove "some bone matter, [and] muscle of the areas that were infected." *Id.* at 123. He spent "almost a week" in the hospital for his operation. *Id.* Mr. Chung testified that he has had "long term effects on [his] abilities with [his right] arm since ... that operation." *Id.* at 124. He is no longer "able to shoot correctly and also maintain military physical training standard." *Id.* Based on our review of the foregoing, we find that there was sufficient evidence that Mr. Chung suffered serious bodily injury. *See* 75 Pa.C.S. § 3735.1(b); *see also Commonwealth v. Caterino*, 451 Pa.Super. 42, 678 A.2d 389 (1996) (serious bodily injury found where victim underwent surgery to repair severed artery).

Mr. Chung further testified as to the injuries that his sister, Susan Chung, sustained from this accident. Ms. Chung, a Michigan resident, was unable to attend the trial due to an unrelated medical issue. *Id.* at 128. Mr. Chung testified that his sister experienced chest pain, and "some" loss of vision, consciousness, and hearing following the accident, and likely caused by the deployment of the airbags in the Chung vehicle. *Id.* at 119, 125. Mr. Chung and his sister were treated and released from the hospital following the accident. *Id.* at 120. Ms. Chung's Pennsylvania hospital records, as well as her records from her subsequent treatment in Michigan, were admitted, with "no objection," as evidence of her injuries and treatment. *Id.* at 127. Despite their admission at trial, Ms. Chung's medical records are not a part of the certified record transmitted to this Court.

■■■ Appellant challenges the sufficiency of his AA–DUI conviction regarding Ms. Chung, and emphasizes Mr. Chung's testimony that Ms. Chung's sensory losses eventually resolved. We are unable to conduct a meaningful review of Appellant's challenge because Ms. Chung's medical records are not a part of the certified record. We may not review that which an appellant, despite bearing the burden to so include, has failed to remit within the certified record. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 423 (2008). In *Powell*, our Supreme Court denied review of the admissibility of an autopsy photograph, and explained:

An appellate court is "limited to considering only those facts that have been duly certified in the record on appeal." *Commonwealth v. Williams*, 552 Pa. 451, 715 A.2d 1101, 1103 (1998). The Rules of Appellate Procedure place the burden on the appellant to ensure that the record contains what is necessary to effectuate appellate review, and they

---

5. This subsection was subsequently deleted on October 19, 2010. *See* P.L. 557, No. 81, § 6, effective December 20, 2010. However, the definition of "serious bodily injury" was reenacted at 75 Pa.C.S. § 102. *Id.*

provide procedures to address gaps or oversights in the compilation and transmission of the record. *See generally* Pa. R.A.P. Ch. 19.

*Id.*

Here, in charging the jury, the trial court expressed:

> I caution you not to allow sympathy, prejudice, or any emotion to influence you. It is your duty to base your decision strictly on the evidence.
>
> The evidence which you are to consider in reaching your decision consists of the testimony of the witnesses which you heard **and the exhibits which you saw introduced.** You must consider all of the testimony of the witnesses and the exhibits, but you must not consider any testimony or exhibits to which I have sustained an objection or which I have ordered stricken from the record.

N.T., 12/6/10, at 298 (emphasis supplied).

After the jury was escorted to the jury room to begin their deliberations, the trial court "ask[ed] counsel to review the verdict slip ... before we send it to the jury ... and also to review all of the evidence that is going out to the jury to insure [sp] that we're sending everything we mean to send." *Id.* at 321. The Commonwealth indicated it had "a box of all the exhibits." *Id.* The record reflects that "(Counsel review[ed] documents)," and that Appellant's counsel had "no objection" to "[e]verything [except for Appellant's toxicology lab results]" being sent out to the jury. *Id.* at 322. Without Ms. Chung's medical records, which the jury was ordered to consider in rendering their verdict, and which the record reflects were provided to the jury during their deliberations, we cannot meaningfully review the seriousness, or lack thereof, of Ms. Chung's injuries. Neither can we disturb the jury's AA–DUI conviction of Appellant relative to Ms. Chung.

Accordingly, we affirm the trial court's determination that Mr. Chung sustained serious bodily injury as required to support Appellant's conviction of AA–DUI relative to Mr. Chung. *See* Trial Court Opinion, 9/16/11, at 6. We further affirm Appellant's conviction of AA–DUI concerning Ms. Chung after finding that Appellant has waived his challenge to same. *Powell, supra.*

### Brady Claim

Appellant's fourth and final issue concerns the purported destruction of material evidence by the Commonwealth in violation of Appellant's rights pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Trooper Armour testified on cross-examination that his vehicle was fitted with an onboard camera which was recording at the time of the accident. N.T., 12/3–6/10, at 74. Trooper Armour stated that following the accident, he reviewed the video recording and determined that 1) it did not depict the accident, which occurred to the right of Trooper Armour's vehicle and outside the field of vision of the camera, and 2) that it was of poor quality due to the presence of other cars between his vehicle and Appellant's, and due to the glare from oncoming headlights. *Id.* Due to its low evidentiary value and the presence of competent eyewitnesses, Trooper Armour did not preserve the recording as evidence, and it was recorded over after 30 days. *Id.* at 76–77, 97. Although a juvenile petition was initiated, criminal charges were not filed at the time the recording was erased. *Id.* at 94.

We review a challenge to a trial court's ruling regarding alleged discovery violations under an abuse of discretion standard. *Commonwealth v. Robinson,* 834 A.2d 1160 (Pa.Super.2003). Appellant

claims the recording was materially exculpatory and should have been preserved.

Under *Brady,* the prosecution's failure to divulge exculpatory evidence is a violation of a defendant's Fourteenth Amendment due process rights. "[T]o establish a *Brady* violation, a defendant is required to demonstrate that exculpatory or impeaching evidence, favorable to the defense, was suppressed by the prosecution, to the prejudice of the defendant."

The burden of proof is on the defendant to demonstrate that the Commonwealth withheld or suppressed evidence. The United States Supreme Court has held, "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." Similarly, this Court has limited the prosecution's disclosure duty such that it does not provide a general right of discovery to defendants. Moreover, we have held that the prosecution is not obligated to reveal evidence relating to fruitless leads followed by investigators.

"To satisfy the prejudice inquiry, the evidence suppressed must have been material to guilt or punishment." As noted by Appellant, materiality extends to evidence affecting the credibility of witnesses, rather than merely to purely exculpatory evidence. Moreover, we have held that the protection of *Brady* extends to the defendant's ability to investigate alternate defense theories and to formulate trial strategy. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

\*     \*     \*

[T]he United States Supreme Court has held that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."

*Commonwealth v. Cam Ly,* 602 Pa. 268, 980 A.2d 61, 75–76 (2009) (internal citations omitted).

■ Here, the trial court determined that Appellant's due process rights were not violated because "the material destroyed was neither exculpatory nor destroyed intentionally to avoid disclosures," and there was no evidence that Trooper Armour acted in bad faith in failing to preserve the recording. Trial Court Opinion, 9/16/11, at 7. We agree with the trial court's determination that the recording was not material to guilt or punishment. The only evidence concerning what appeared on the video was provided by Trooper Armour's testimony. Trooper Armour testified that the recording did not show Appellant's vehicle or the accident. Appellant claims that the video may have provided evidence regarding whether Mr. Chung was operating his vehicle in a dangerous manner. Nevertheless, Appellant's assertion can never be verified because the recording does not exist and no evidence contradicts, or could otherwise be seen to impeach, Trooper Armour's testimony regarding the content of the recording. Thus, Appellant's claim that the recording may have depicted Mr. Chung engaging in unsafe driving is purely speculative. The "mere possibility" that the recording "might have" depicted events differently does not establish "materiality." *See Cam Ly,* 980 A.2d at 76 (citing *United States v. Agurs,* 427 U.S. 97, 109–110, 96 S.Ct. 2392,

49 L.Ed.2d 342 (1976)). Accordingly, we hold that Appellant's due process rights were not violated by Trooper Armour's failure to preserve the recording.

Judgment of sentence AFFIRMED.

P.J.E. FORD ELLIOTT and Judges BOWES, GANTMAN and OTT join the majority.

P.J. BENDER files a Concurring and Dissenting Opinion in which Judges DONOHUE, LAZARUS and WECHT join.

CONCURRING AND DISSENTING OPINION BY BENDER, P.J.

I am in agreement with the Majority's disposition with regard to Appellant's claims, except for its conclusion that there was sufficient evidence of causation underlying Appellant's four AA–DUI convictions. Although Appellant's criminal conduct was undoubtedly a substantial cause of the injuries sustained by the victims in this case, I believe it to be equally evident that his conduct was not a direct cause of those injuries. Consequently, I would conclude that the evidence was not sufficient to sustain Appellant's AA–DUI convictions and would reverse on that basis. Accordingly, I respectfully dissent.

In *Commonwealth v. Root*, 403 Pa. 571, 170 A.2d 310 (1961), our Supreme Court held that "the tort liability concept of proximate cause has no proper place in prosecutions for criminal homicide and more direct causal connection is required for conviction." *Id.* at 314. Stated generally, the *Root* standard for criminal causation holds that, in order for criminal liability to attach, "[t]he defendant's conduct must be a *direct **and** substantial cause* of the injury" that is defined by the charged offense. *Commonwealth v. Uhrinek*, 518 Pa. 532, 544 A.2d 947, 951 (1988) (emphasis added).

In this case, I would conclude that the Commonwealth failed to provide sufficient evidence of direct causation to support Appellant's AA–DUI convictions. Appellant's conduct, viewed in a light most favorable to the Commonwealth, was almost by definition an indirect cause, and not a direct cause, of the resulting injuries. This is true unless the distinction between 'indirect' and 'direct' is to be rendered meaningless. The term 'direct,' when used as an adjective to modify 'cause,' connotes "[h]aving no intervening persons, conditions, or agencies; immediate." The American Heritage Dictionary 244 (4th ed. 2001). Clearly, in this case, it was Mr. Chung's collision that was the direct cause of the resulting injuries. That Appellant's conduct was a more substantial cause than Mr. Chung's conduct is immaterial to the question of directness.

The Commonwealth contends that accepting a literal definition of the term 'direct' amounts to a requirement that a defendant's vehicle collide with his victim (or the victim's vehicle) in order to sustain a conviction for AA–DUI. I admit that, as a practical matter, this may largely be true. Proving direct causation for purposes of the AA–DUI statute absent such a collision may indeed be a daunting or insurmountable task. However, the notion that the AA–DUI statute *should* cover Appellant's conduct in this case is an opinion grounded in the understandable belief that Appellant should be held accountable for his conduct where it was the most substantial factor in causing the injuries that occurred in this case. It is not an opinion grounded in *Root's* requirement that causation for criminal purposes be both "direct and substantial," as the plain meaning of the term "direct" is inapplicable to the circumstances of this case.

The division between the Majority's position and my own is not merely an honest

disagreement about what reasonable inferences flow from the factual circumstances of this case. What is at stake is the long-held distinction between civil and criminal standards of causation in Pennsylvania jurisprudence. Here, the Majority makes a compelling case for why Appellant *should be held responsible for his behavior*, but not why his conduct was a *direct* cause of the injuries that occurred.

The Majority is not solely to blame for the disintegration of the distinction between the civil and criminal standards of causation. The distinction was first called into question with Pennsylvania's adoption of Section 2.03(1) of the Model Penal Code, the source of the following provision in our Criminal Code:

> **(a) General rule.**—Conduct is the cause of a result when:
>
> (1) it is an antecedent but for which the result in question would not have occurred; and
>
> (2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.

18 Pa.C.S. § 303(a).

The terms of section 303(a)(1) express the tort standard of "proximate cause" or "but for" causation. 18 Pa.C.S. § 303 (official comment). Little more than a decade before section 303(a)(1) was adopted by our legislature, in *Root,* our Supreme Court held that a stricter standard applies. *Root,* 170 A.2d at 314 ("[T]he tort liability concept of proximate cause has no proper place in prosecutions for criminal homicide and more direct causal connection is required for conviction.") One might think that the adoption of section 303(a)(1) su-

perseded the criminal standard of causation as expressed by our Supreme Court in *Root* and would, therefore, easily resolve the matter before us today.[1] Indeed, the Commonwealth argues that nothing more than "but for" causation is required to sustain a criminal conviction. Commonwealth's Brief at 3.

However, only three months following the adoption of Section 303(a)(1), our Supreme Court endorsed an appellant's citation to *Root* for the proposition that "the causal connection required to attach criminal responsibility must be more direct than the tort law concept of proximate cause." *Commonwealth v. Stafford,* 451 Pa. 95, 301 A.2d 600, 602 (1973). The following year, our Supreme Court again rejected the application of "the tort theory of causation" to criminal law in *Commonwealth v. Skufca,* 457 Pa. 124, 321 A.2d 889, 894 (1974). Both the *Stafford* and *Skufca* decisions fail to mention Section 303(a)(1) at all. This may be explained away, in part, because the trials of Skufca and Stafford both occurred before Section 303(a)(1) became law. However, no such explanation can be provided for our Supreme Court's endorsement of the *Root* principle several years later in *Commonwealth v. Matthews,* 480 Pa. 33, 389 A.2d 71, 73 (1978) ("So long as a defendant's actions are a direct and substantial factor in bringing about death, legal responsibility may be found.") (citing, *inter alia, Stafford, supra* ).

While Section 303 may have merely heralded the erosion of the criminal/civil causation distinction, it did not appear to have any impact for nearly twenty years after its adoption. That is until *Commonwealth v. Rementer,* 410 Pa.Super. 9, 598 A.2d 1300 (1991), a panel decision by this Court cited favorably by the Majority. In *Re-*

---

1. If there is any dispute that Appellant's conduct was the proximate cause of the injuries that occurred in this case, I am unaware of it.

*menter*, the defendant engaged in a brutal and sustained assault on the victim. The beating continued as the male defendant followed his female victim into her tractor-trailer cab. One witness observed the victim attempting to escape from the cab through a window while shouting "Help me, he's trying to kill me." *Id.* at 1302. She briefly managed to escape by falling through that window, only to be dragged back into the cab moments later by the defendant, who continued to beat her. A later escape attempt while the cab was parked on a highway proved fatal. As the victim fled from the cab, she tried to get the attention of a passing station wagon. Fearful, the driver of the station wagon sped away, and in doing so ran over the victim, killing her. The defendant was convicted of third degree murder. In his appeal, he argued that the Commonwealth had failed to prove causation because of the intervening action of the station wagon driver. The *Rementer* Court rejected that argument, holding that "[i]t [was] absurd to argue that the fatal result was so extraordinary or accidental that [the defendant] should not be held criminally liable for the consequences of his conduct." *Id.* at 1308.

The *Rementer* decision at least paid lip service to the *Root* standard, stating that "[i]n order to impose criminal liability, causation must be direct and substantial." *Rementer*, 598 A.2d at 1304. However, by the conclusion of the *Rementer* decision, the *Root* standard appears to have been abandoned and replaced. In *Commonwealth v. Nunn*, 947 A.2d 756 (Pa.Super.2008), another panel of this Court summarized the *Rementer* standard as follows:

In *Rementer*, we set forth a two-part test for determining criminal causation. First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. *Rementer*, 598 A.2d at 1305; 18 Pa.

C.S.A. § 303(a)(1). A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." *Rementer*, 598 A.2d at 1305, n. 3 (quoting LaFave and Scott, Substantive Criminal Law, Vol. 1, Ch. 3., at 391–392 (1986)). Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible. *Rementer*, 598 A.2d at 1305.

*Nunn*, 947 A.2d at 760.

The first prong of the *Rementer* standard is drawn directly from Section 303(a)(1) of the Crimes Code, and, thus, it constitutes the tort standard of causation ('proximate' or 'but for' causation). *Rementer*, 598 A.2d at 1305; 18 Pa.C.S. § 303 (official comment). This was nothing new, as criminal causation had always been defined in reference to the tort standard, and the *Root* standard could be defined as proximate cause *plus* directness. Thus, a failure to demonstrate that a defendant's actions were the proximate cause of injuries would be fatal to a prosecution. However, a mere showing of proximate cause would also be insufficient under the *Root* standard.

The novelty of the *Rementer* standard was its second prong: "whether the result of defendant's actions w[as] so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." *Rementer*, 598 A.2d at 1305. By replacing the 'directness' element of the *Root* standard with a 'fairness' element, I believe the gap between the criminal and civil causation standards was significantly diminished, if not eliminated.

What if a jury determines that a showing of proximate cause alone is *fair* in the context of a particular case, either due to the abhorrent intent of the perpetrator, or the severity of the resulting injuries? This type of *ad hoc* causation analysis, explicitly endorsed by the *Rementer* Court, invited the comingling of elements and permitted what was not permitted under the *Root* standard—a criminal conviction under the civil standard of causation.[2, 3]

And with what authority did the *Rementer* Court act in redesigning the criminal causation standard? The decision itself cited Section 303, but as noted *supra,* our Supreme Court largely ignored the implications of Section 303 long after that provision was codified, despite several opportunities to at least address its impact on the preexisting *Root* standard. Still, Section 303 defines the proximate cause standard that is identical to the "substantial" language contained in the *Root* standard.

For the more troublesome second prong, the *Rementer* Court first cited our Supreme Court's decision in *Commonwealth v. Paquette,* 451 Pa. 250, 301 A.2d 837 (1973). However, the *Paquette* Court cited the *Root* standard and contained none of the 'fairness' language set forth in *Rementer.* Second, the *Rementer* Court cited *Commonwealth v. Howard,* 265 Pa.Super. 535, 402 A.2d 674 (1979). That decision was also 'rooted' in the *Root* standard. *Howard* also cited *Skufca* favorably; but *Skufca* also purported to apply *Root,* albeit in peculiar factual circumstances. Therefore, it is apparent to me that the *Rementer* Court modified the standard of criminal causation in Pennsylvania without any authority to do so. *Rementer* has subsequently been cited as controlling authority by this Court on nineteen occasions, including this one. Our Supreme Court, by contrast, has never cited to *Rementer* but for a single occasion when a reference to it was contained in a quotation from the Superior Court decision that was ultimately reversed. *See Commonwealth v. Gaynor,* 538 Pa. 258, 648 A.2d 295 (1994) (quoting from *Commonwealth v. Gaynor,* 417 Pa.Super. 417, 612 A.2d 1010 (1992)).

*Rementer* represents a case of bad facts producing bad law. Still, a reasonable argument exists that *the result* in *Rementer* was justified under the *Root* standard of causation. There was nothing 'indirect' about the appellant's beating of the victim, which began the chain of causation that led

---

**2.** In *Rementer,* the Court rationalized that "criminal causation has come to involve a case-by-case social determination; *i.e.,* is it just or fair under the facts of the case to expose the defendant to criminal sanctions." *Id.* at 1304.

**3.** I am cognizant of the *Rementer* Court's statement that its 'fairness' prong is simply another way of phrasing the 'directness' element of the **Root** standard. *Rementer,* 598 A.2d at 1306–07 ("Thus, the defendant's conduct must bear a direct and substantial relationship to the fatal result in order to impose criminal culpability. *Put another way,* if the fatal result was an unnatural or obscure consequence of the defendant's actions, our sense of justice would prevent us from allowing the result to impact on the defendant's guilt.") (emphasis added). However, I disagree that those standards are interchangeable. In *Novak v. Jeannette Dist. Mem'l Hosp.,* 410 Pa.Super. 603, 600 A.2d 616 (1991), this Court defined "proximate cause" as "an issue of law, *i.e.,* whether the defendant's negligence, if any, was so remote that, as a matter of law, he cannot be held legally responsible for harm which subsequently occurred." *Id.* at 618 (citing *Flickinger Estate v. Ritsky,* 452 Pa. 69, 305 A.2d 40, 43 (1973)). With this in mind, it seems that unnatural or obscure consequences of a defendant's conduct are unlikely to permit a finding of proximate causation. Thus, the second prong of the *Rementer* test does not provide any additional objective criteria with which to evaluate whether criminal causation has been proven other than what was already required for a finding of proximate causation.

to the victim's death. Furthermore, the victim's attempt to escape while being beaten on a highway presented the foreseeable risk that she could be fatally struck by passing traffic. In that sense, the facts of *Rementer* were at least somewhat analogous to other cases that held, under the *Root* standard, that direct causation was proven where a defendant committed a violent act and the victim did not die immediately from the inflicted wound, but instead died later from complications created by the wound. *See Commonwealth v. Cheeks*, 423 Pa. 67, 223 A.2d 291 (1966) (holding criminal causation proven where stab wound necessitated an operation to save the victim's life, and the victim, while in a disoriented mental state, died after pulling out tubes that been inserted into his body during that operation); *see also Commonwealth ex rel. Peters v. Maroney*, 415 Pa. 553, 204 A.2d 459 (1964) (holding criminal causation proven where elderly robbery victim, who had been knocked to the ground and kicked by the defendant, died eight days later of pneumonia in the hospital while being treated for the injuries caused by the defendant). In those cases, as well as in *Rementer*, there was a direct, violent act that began the chain of causation leading to the victim's death.

However, subsequent decisions, including the instant one, have relied upon *Rementer* to dispose of the directness requirement altogether. Of note is *Commonwealth v. McCloskey*, 835 A.2d 801 (Pa.Super.2003), a case cited favorably by the Majority. In *McCloskey*, the defendant permitted her minor daughters to have a keg party with forty other minors in her basement while she was present on the first floor. One of the partygoers, who was intoxicated, drove away from the party with three passengers. The driver sideswiped a vehicle and, while fleeing the scene of that initial accident, flipped his own vehicle, causing his passengers' deaths. A panel of this Court upheld three convictions for involuntary manslaughter and rejected the defendant's argument that the Commonwealth failed to establish causation. In doing so, the *McCloskey* Court specifically cited and emphasized the second prong of the *Rementer* standard in reaching its decision. *McCloskey*, 835 A.2d at 808. In the wake of *McCloskey*, it is hard to believe that the long-held distinction between civil and criminal causation standards still exists in Pennsylvania, despite lip service still being paid to the *Root* standard.

Here, the relationship between Appellant's erratic driving and Mr. Chung's injury causing collision is inherently indirect. The Majority devotes much of its discussion to the causation issue by discussing Mr. Chung's *intent*, in an attempt to strike down Appellant's embellished argument that Mr. Chung was acting as a vigilante. Majority Opinion at 376–80. Chung's intent, however, has nothing to do with whether he was an intervening or superseding cause. His intent is a red herring under the *Root* standard. It is only relevant to the vague notion of whether it is fair to hold Appellant accountable if Mr. Chung was 'innocent,' and not whether Appellant's actions were the direct cause of the injuries in this case.

Even assuming, for the sake of argument, that causation could be satisfied under the AA–DUI statute without Appellant's being directly involved in the collision, a far more relevant inquiry would be whether Mr. Chung was driving too close to Appellant to avoid a collision. Mr. Chung could not answer this question, despite being in the best position to do so. N.T. 12/3/10, at 131. He saw Appellant "swerving all over . . . the center line" and nearly collide with another car

*before* he called police. N.T. 12/3/10, at 110–11. And yet, after witnessing the danger presented ahead of him, he did not retreat a safe distance by slowing his vehicle, which would have given him more time to react in the event that Appellant continued doing what Mr. Chung had already observed him doing.

These facts are important because they demonstrate that while Appellant's erratic driving created the possibility that a crash might occur, it was Chung's behavior (irrespective of his intent) that turned that possibility into a near certainty. The Majority suggests that Chung had but three choices: to wreck into Appellant's vehicle, to turn left and wreck into another moving vehicle, or to turn right onto the berm. However, Chung clearly had a fourth choice, which was to maintain a safe distance from a vehicle that he had already observed swerving dangerously in front of him.

This is not to say that Appellant's conduct was not criminal or that he should go unpunished—far from it. The body of criminal law provides numerous criminal sanctions for individuals who create risks of injury or death independent of statutes that require a causal nexus between a criminal act and a victim's injuries. However, when a statute requires causation of a particular result, as does the AA–DUI statute, a defendant's actions must be both a direct and substantial factor in bringing about that result. *Root.* The uncontroverted evidence established that Appellant did not collide with any of the victims or their vehicles. Although Appellant is responsible for creating a risk that such injuries could result, such a relationship in causation is inherently indirect.

Thus, under the facts of this case, I would conclude that there was insufficient evidence of direct causation to support Appellant's AA–DUI convictions. I dis-

agree with the Majority's endorsement of the *Rementer* standard, which, for the reasons set forth *supra,* constitutes an implicit repudiation of our Supreme Court's criminal causation standard as set forth in *Root,* and an abandonment of the distinction between criminal and civil causation standards. Similarly, I disagree with the Majority's reliance on *McCloskey,* as the ruling in that case should be overruled as unsustainable under the *Root* standard of criminal causation.

I respectfully dissent.