J-S27028-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PEDRO SANTANA | |
| Appellant | No. 1835 EDA 2014 |

Appeal from the Judgment of Sentence entered March 25, 2014
In the Court of Common Pleas of Lehigh County
Criminal Division at No: CP-39-CR-0002788-2012

BEFORE: FORD ELLIOTT, P.J.E., STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY STABILE, J.: **FILED JULY 20, 2015**

Pedro Santana appeals from the judgment of sentence entered in the Court of Common Pleas of Lehigh County (trial court), after he pled guilty to robbery and conspiracy to commit robbery.[1] On appeal, Appellant challenges only the trial court's denial of his motion to transfer his case to juvenile court. Upon review, we affirm the judgment of sentence.

On May 29, 2012, Detective Michael Williams, Allentown Police Department, charged Appellant with, *inter alia*, robbery, conspiracy to commit robbery, burglary, and theft by unlawful taking. In his affidavit accompanying the complaint, Detective Williams stated in part:

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(ii), and 903(a), respectively.

2) [I] was asked to assist with a home invasion robbery being [investigated] by Detective Michael Popovich that occurred on May 26, 2012 at approximately 1245 hrs[.]

3) The victim reported a home invasion robbery, stating 3 males entered her home without permission and 2 of the 3 males were armed with handguns. Victim reported that the males demanded money and place[d] a handgun to her head and her 9 year old daughter[']s head.

4) Victim reported the males took computers, jewelry, cash and a cell phone. Value of all items estimated at $3000.00.

5) Detective Popovich responded to 973 Cedar St where one of the Defendants-Marco Tavarez[-] had been stopped and was found in possession of some of the stolen items and a mask.

6) Detective Popovich and Detective Almonte conducted interviews with two of the actors and it was determined that Juvenile-[Appellant-] (6/18/94) was the third actor in the home invasion robbery.

7) Detective Popovich was able to confirm this during a mirandized interview with [] Juan Cruceta. Cruceta identifie[d] the father and older brother of [Appellant] from photos provided by Detective Popovich.

8) Detective Popovich obtain[ed] a photo of [Appellant] from Facebook and actor Juan Cruceta positively identifie[d] him from the photo as being part of the home invasion robbery.

Affidavit of Probable Cause, 5/29/12.

On October 29, 2012, Appellant filed a motion for decertification titled "Motion to Transfer to Juvenile Court," alleging that he was 17 years old at the time of the home invasion robbery.[2] Motion for Decertification, 10/29/12, at ¶ 2. Based on his age, Appellant argued he was "in need of a program of supervision, care and rehabilitation." *Id.* at ¶ 3. He argued his

_____

[2] To put his age in proper perspective, he was 17 years old at the time of the May 26, 2012 home invasion robbery. It is undisputed that, less than one month after the robbery, Appellant turned 18 on June 24, 2012, based on his date of birth of June 24, 1994.

criminal prosecution would not serve the public interest. *See id.* at ¶ 4. Appellant also argued that, although he was involved in the home invasion robbery, his involvement was limited to staying outside of the victim's house. *See id.* at ¶ 5.

On July 2, 2013, the trial court conducted a hearing on Appellant's decertification motion. In support of his motion, Appellant presented the testimony of Dr. Frank Dattilio. Dr. Dattilio testified he obtained his Ph.D. in clinical psychology from Temple University and practiced as a clinical and forensic psychologist in Allentown. N.T. Decertification Hearing, 7/2/13, at 6-8. Dr. Dattilio testified he evaluated Appellant in connection with Appellant's motion for decertification. *Id.* at 12. Dr. Dattilio testified he met Appellant on two occasions at the Lehigh County Prison, researched and reviewed the complete history of Appellant's life, and examined, among other documents, the criminal complaint and affidavit of probable cause, Lehigh County Prison records, and Appellant's ninth-grade high school progress reports. *Id.* at 12-13. Dr. Dattilio also testified that he administered a mental status examination and "a battery of psychological tests and appraisals" that included an IQ test. *Id.* at 13.

> In discussing the results of the tests, Dr. Dattilio testified:
>
> I found that [Appellant] was oriented in time, place and person when I assessed his mental status. I also found that he was devoid of any psychotic ideation interfering with his primary and secondary thought processes. [Appellant] also denied any serious anxiety and depression, but did admit that he could be impulsive at times and has difficulty thinking through his actions. Otherwise, he certainly was oriented in time, place – oriented in time, place and person and knew what he was doing. I also

found on an IQ test that he complete[d] full scale IQ score of 56, which placed [Appellant] in the mild mentally retarded range. He did seem to have the highest scores in his abilities to learn from past experiences which fell in the low, average rage, but otherwise he is clearly in the mild mentally retarded range at 56.

In addition I found that [Appellant] had some problems with hostility as well as depression. There's some difficulty with impulse control. He does not have any other serious psychopathology nor was there any indication of serious substance abuse or dependence with him.

[Appellant] also – he had some difficulties with family problems, particularly, his stepmother. And he also has difficulty at times expressing himself. He's also very prone towards being influenced by others and he is a little bit vulnerable to peer pressure.

I did not find that he had any serious psychopathology that would warrant the diagnosis of anti-social personality or anything more serious than that. And I found that he also was able to take responsibility and experience remorse.

*Id.* at 24-25. With respect to Appellant's level of maturity, Dr. Dattilio opined:

Well, he's a little bit on the immature side despite the fact that he's eighteen. He's really more on the level of a fifteen or sixteen-year-old. [Appellant] was a little bit sheltered during [his] life, and I think that part of what happened with him is that he became involved with some Dominican youths who he – he kind of followed the fleet. You know. He is mentally retarded. His ability to develop insight is not as good as what we would find with most individuals who are average IQ. I think [Appellant] was very vulnerable. And so, that immaturity played against him. So, we're not talking about somebody who is very sophisticated or, you know, eighteen going on thirty, this is really somebody that's very immature for his age.

*Id.* at 27. Dr. Dattilio noted the absence of a criminal record on Appellant's part. Specifically, Dr. Dattilio testified "this is the first incident and that counts for a lot. It certainly says that [Appellant is] amenable to treatment because he does not have this hardened history of becoming involved in anti-social acts." *Id.* at 34. In recommending Appellant would benefit from

the juvenile system, Dr. Dattilio opined with a reasonable degree of psychological certainty:

> [Appellant] is amenable to treatment and decertification in the juvenile system prior to the age of twenty-one, and that it would be in the best interest of the public for him to do so. I'm recommending that [Appellant] be considered for a juvenile placement such as ARC or Loysville . . . because they have a Spanish component to the program that also involves English emergence so that he will learn English through that program. . . . I also believe that at this program, [Appellant] will be afforded the type of individual and group psychotherapy that will help him work on his issues of anxiety and depression as well as his poor impulse control. I also see that there are some anger issues with him that he needs how to learn to facilitate and redirect and these programs are excellent for acquiring management skills, as well as emotional regulation.
>
>  . . . .
>
> In addition, I think that, you know, consultation with a psychiatrist in this program may be helpful too if his depression or anxiety doesn't abate.
>
> He also needs some direction with regard to goals and objectives for him in his life to complete the GED. I think he would be a prime candidate once he acquires more fluency in English to become involved in Job Corp[s] Program or something that would provide him with skills, training.

*Id.* at 37-38.

On cross-examination, Dr. Dattilio acknowledged Appellant was aware that his cohorts were going to commit an armed home invasion robbery prior to its occurrence. *Id.* at 44-45. Dr. Dattilio also acknowledged Appellant was aware prior to the armed home invasion robbery that people would be inside the house. *Id.* at 45. Dr. Dattilio, however, clarified that Appellant was not aware that there was going to be a child inside the house and that Appellant "was a little upset when he found out there was a child involved." *Id.*

Dr. Dattilio admitted Appellant did not "actually accept full responsibility" for his participation in the home invasion robbery and did not tell Dr. Dattilio exactly what Appellant had done. *Id.* at 47. Moreover, Dr. Dattilio admitted Appellant minimized his role in the home invasion robbery, as "most juveniles do that." *Id.* Dr. Dattilio recognized Appellant was eighteen at the time he examined Appellant. *Id.* Dr. Dattilio acknowledged Appellant was living with his twenty-one-year-old girlfriend at the time of the crime, and attending school sporadically. *Id.* at 49.

Finally, Dr. Dattilio agreed Appellant would receive "all of the things that are recommended" by him if the court were to send Appellant to SCI Pinegrove instead of a juvenile facility. *Id.* at 56. By subjecting Appellant to the adult system, Dr. Dattilio also agreed Appellant would have "the added benefit of extended supervision." *Id.* at 58.

In response, the Commonwealth presented the testimony of Detective Kevin Mriss, a sixteen-year veteran of the Allentown Police Department. *Id.* at 66. Detective Mriss testified, as part of his job duties, he was familiar with the treatment options available to juvenile and adult offenders. *Id.* at 67. Describing the nature of home invasion robberies, Detective Mriss testified they "are very serious due to very violent takeovers of homes. The violence that is employed by the actors. The threat of violence that could erupt once the act[or] is inside the home[.]" *Id.* at 68. He explained that home invasion robberies are sophisticated in nature because of "[t]he use of weapons, the use of gloves and masks," as well as the need for surveillance

and a getaway driver. *Id.* at 69. Ultimately, Detective Mriss opined Appellant should remain in the adult system, given the nature of the crime, specially the use of handguns in the violent takeover of the victim's house on a Saturday afternoon. *Id.* at 71.

Following the hearing, on September 16, 2013, the trial court issued an opinion and order, denying Appellant's motion for decertification. On January 27, 2014, Appellant pled guilty to robbery and conspiracy to commit robbery and on March 25, 2014, the trial court sentenced Appellant to 54 to 120 months' imprisonment. On March 31, 2014, Appellant filed a post-sentence motion, which the trial court denied on June 16, 2014. Thereafter, Appellant timely appealed to this Court.[3]

On appeal, Appellant raises a single issue for our review:

[1.] Whether the trial court erred when it failed to thoroughly analyze the relative statutory factors and concluded that a transfer to juvenile court would not serve the public interest?

Appellant's Brief at 4.

We review a trial court's denial of a motion for decertification for abuse of discretion. *See Commonwealth v. Smith*, 950 A.2d 327, 328 (Pa. Super. 2008) (citation omitted) ("[D]ecisions of whether to grant

---

[3] Following Appellant's filing a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, the trial court issued a Pa.R.A.P. 1925(a) opinion, wherein the court incorporated its September 16, 2013 opinion addressing the denial of Appellant's motion for decertification.

decertification will not be overturned absent [] abuse of discretion."). "An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment passed upon partiality, prejudice or ill will." *Id.*

> Pursuant to 42 Pa.C.S.A. § 6322(a) [of the Juvenile Act (Act)], when a juvenile has committed a crime, which includes murder, or any of the other offenses listed under paragraph (2)(ii) or (iii) of the definition of "delinquent act" in 42 Pa.C.S.A. § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction. Likewise, 42 Pa.C.S.A. § 6355(e) explains that charges of murder, or any of the other offenses listed under paragraph (2)(ii) or (iii) of the definition of "delinquent act" in 42 Pa.C.S.A. § 6302, requires that the offense be prosecuted in the criminal division. "Robbery," when committed with a deadly weapon, is one of the offenses listed which requires jurisdiction to vest in the criminal division. 42 Pa.C.S.A. § 6302.
>
> When a case goes directly to criminal division, the juvenile has the option of requesting treatment within the juvenile system through a transfer process of "decertification." [*Commonwealth v.*] *Aziz*, 724 A.2d [371,] 373 [(Pa. Super. 1999)]. In determining whether to transfer such a case from criminal division to juvenile division, "the child shall be required to establish by a preponderance of the evidence that the transfer will serve the public interest." 42 Pa.C.S.A. § 6322(a). *See also*, *Aziz*, 724 A.2d at 373.

*Commonwealth. v. Sanders*, 814 A.2d 1248, 1250 (Pa. Super. 2003), *appeal denied*, 827 A.2d 430 (Pa. 2003).

In determining whether the child has established that the transfer will serve the public interest, the trial court must consider the factors set forth in Section 6355(a)(4)(iii) of the Act. These factors are as follows:

(4) The court finds:

. . . .

(iii) that there are reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution. In determining whether the public interest can be served, the court shall consider the following factors:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

    (I) age;

    (II) mental capacity;

    (III) maturity;

    (IV) the degree of criminal sophistication exhibited by the child;

    (V) previous records, if any;

    (VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

    (VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

    (VIII) probation or institutional reports, if any;

    (IX) any other relevant factors[.]

42 Pa.C.S.A. § 6355(a)(4)(iii).  Although it requires a trial court to consider all of these factors, the Juvenile Act is silent on the weight assessed to each by the court, as "[t]he ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of the [trial] court."

*Commonwealth v. Brown*, 26 A.3d 485, 492-93 (Pa. Super. 2011); *see also Sanders*, 814 A.2d at 1251 ("A decertification court must consider all of the factors set forth in Section 6355 of the Juvenile Act, but it need not address, *seriatim*, the applicability and importance of each factor and fact in reaching its final determination.").

Instantly, Appellant challenges only the weight the trial court attributed to each Section 6355(a)(4)(iii) factor.[4]  Specifically, Appellant argues "the trial court gave significantly more weight to factors A, B and D . . . than the remaining factors."  Appellant's Brief at 13.  We construe Appellant's argument as inviting this Court to reweigh the Section 6355(a)(4)(iii) factors.  As a reviewing court, however, we may not reweigh statutory factors set forth in Section 6355(a)(4).  *See Commonwealth v. In re E.F.*, 995 A.2d at 326, 333 (Pa. 2010) ("It is further not the role of an appellate court to reweigh statutory factors to conclude that the seriousness of the offense and the deleterious effects suffered by the victim warrant certification.").  Moreover, as noted earlier, the Juvenile Act is silent as to the weight to be afforded to each factor, as that is left to the sole discretion

---

[4] Here, it is undisputed that Appellant was charged with an offense that properly vested jurisdiction in the criminal court.  Specifically, Appellant was charged in connection with an *armed* home invasion robbery, and under Section 6302 of the Juvenile Act, robbery with a deadly weapon is excluded from the definition of "delinquent act."  *See* 42 Pa.C.S.A. § 6302.

of the trial court.[5] ***Commonwealth v. Jackson***, 722 A.2d 1030, 1033-34 (Pa. 1999). Accordingly, we reject as meritless Appellant's challenge to the weight ascribed by the trial court to the Section 6355(a) factors.

Nonetheless, based upon our review of the record, as set forth above, we conclude the trial court did not abuse its discretion in denying Appellant's decertification motion. As the trial court reasoned:

> [Appellant] has failed to meet his burden. [Appellant] participated in a home invasion robbery, wherein two of his co-defendants threatened a mother and her 9 year old daughter by holding guns to their heads. The crime occurred on a Saturday afternoon. The impact of this on the victims and the community can only be described as severe. [Appellant] was aware of what was going to happen prior to any of the actors entering the home. He had the opportunity to reflect on what he was going to do, but still chose to participate. There was evidence that the actors planned this home invasion, including targeting that specific home, arriving with gloves, masks, and handguns, and having a getaway driver. [Appellant] participated in a violent, adult crime, and was himself just shy of being legally an adult at the time. While [Appellant] suffers from mild mental retardation, his needs in this area can be addressed in the adult system. [The trial court does] not find [Appellant] has met his burden of establishing that a transfer to the juvenile system will serve the public interest. As such, the motion must be denied.

Trial Court Opinion, 9/16/13, at 4.

---

[5] Even if the trial court did not explicitly address certain factors enumerated in Section 6355(a)(4)(iii) of the Juvenile Act, such a scenario does not automatically render the juvenile court's decision an abuse of discretion, particularly when the record contains adequate facts supporting the juvenile court's ruling. ***Commonwealth v. Spotti***, 94 A.3d 367, 373 (Pa. Super. 2014) (citing ***Jackson***, 722 A.2d at 1034 ("The presumption in this Commonwealth remains that if a court has facts in its possession, it will apply them[,]" and "[w]hen evaluating the propriety of a certification decision, absent evidence to the contrary, a reviewing court must presume that the juvenile court carefully considered the entire record.")), ***appeal granted on other grounds***, 107 A.3d 748 (Pa. 2015).

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/20/2015