J-S26023-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JASON ALLEN MAINES | : | |
| | : | |
| Appellant | : | No. 1541 WDA 2019 |

Appeal from the PCRA Order Entered September 20, 2019
In the Court of Common Pleas of Cambria County Criminal Division at
No(s):  CP-11-CR-0001919-2013

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JASON MAINES | : | |
| | : | |
| Appellant | : | No. 1545 WDA 2019 |

Appeal from the PCRA Order Entered September 20, 2019
In the Court of Common Pleas of Cambria County Criminal Division at
No(s):  CP-11-CR-0000774-2013

BEFORE:   MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:          **FILED SEPTEMBER 17, 2020**

Jason Maines appeals the denial of his request for relief under the Post

Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Maines challenges

the Commonwealth's closing argument raises a ***Brady***[1] claim, and argues his

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] ***Brady v. Maryland***, 373 U.S. 83 (1963).

trial counsel was ineffective. We affirm on the basis of the PCRA court's opinion. **See** PCRA Ct. Op., filed Sept. 20, 2019.

In 2014, a jury found Maines guilty of Criminal Attempt – Possession with Intent to Deliver; Criminal Attempt – Possession of a Controlled Substance; Terroristic Threats; and Witness Intimidation.[2] The jury also found him guilty at a separate docket of Conspiracy – Robbery; Robbery; Burglary; Criminal Trespass; and two counts of Aggravated Assault.[3] The trial court imposed an aggregate sentence of 19 to 40 years' incarceration. We affirmed the judgment of sentence, and our Supreme Court denied Maines' petition for allowance of appeal. **See Commonwealth v. Maines**, No. 584 MDA 2015, 2016 WL 1734921 (Pa.Super. filed May 2, 2016) (unpublished memorandum), *appeal denied*, 160 A.3d 758 (Table) (Pa. filed Oct. 25, 2016).

Maines filed the instant timely PCRA petition in November 2017. The PCRA court appointed counsel who filed an amended PCRA petition.[4] The PCRA court held a hearing after which it denied the PCRA petition. This timely appeal followed.

On appeal, Maines raises the following issues:

---

[2] 18 Pa.C.S.A. § 901, 35 P.S. § 780-113(a)(30); 18 Pa.C.S.A. § 901, 35 P.S. § 780-113(a)(16); 18 Pa.C.S.A. § 2706(a)(1); and 18 Pa.C.S.A. § 4952(a)(1), respectively.

[3] 18 Pa.C.S.A. §§ 903, 3701(a)(1); 3701(a)(1); 3502(a)(1); 3503(a)(1); and 2702(a)(1), (a)(4), respectively.

[4] The counsel whom the court initially appointed obtained leave to withdraw, and the court appointed new counsel who entered his appearance in December 2018.

1. Did the lower court err by denying PCRA Relief on the basis of constitutional violations by the Commonwealth when the Commonwealth:

a. engaged in impermissible inflammatory rhetoric, impermissible vouching, and impermissible Biblical references during closing argument?

b. failed to disclose exculpatory evidence in the form of two discarded prior statements by a witness who implicated [Maines] in a third statement?

2. Did the lower court err by denying PCRA Relief on the basis of ineffective assistance of counsel when trial counsel:

a. failed to disclose a conflict of interest in the form of his own contemporaneous prosecution by the same office that was prosecuting [Maines]?

b. failed to raise a viable *Brady* claim concerning the deprivation of inconsistent witness statements?

c. failed to object to impermissible rhetoric by the Commonwealth during closing argument?

d. failed to conduct a sufficient investigation?

e. failed to sufficiently cross-examine witnesses, challenge a photographic array, present evidence concerning alternative suspects, object to impermissible evidence, and challenge the identification of a vehicle as belonging to [Maines]?

3. Did the lower court err by denying relief on the cumulative effect of multiple errors?

Maines' Br. at 2-3.

When reviewing the denial of PCRA relief, we determine whether "the determination of the PCRA court is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." *Commonwealth v.*

*Larkin*, --- A.3d ----, 2020 WL 3869710, at *4 (Pa.Super. 2020) (*en banc*) (citation omitted).

Maines claims that the prosecutor made impermissible comments in closing argument. He argues that the Commonwealth's closing argument was improper because it vouched for the credibility of witnesses and included biblical references. Maines' Br. at 16, 19. This claim is waived as Maines could have raised this issue on direct appeal, but failed to do so. *See* 42 Pa.C.S.A. § 9544(b) ("an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding").

Next, Maines alleges that the Commonwealth withheld exculpatory evidence, in violation of *Brady*, in the form of two statements from a witness, Michael Edwards, that a detective allegedly threw in the trash. He waived this claim as well by not raising it on direct appeal.

Maines also claims that the PCRA court erred in denying his ineffectiveness claims. He argues that trial counsel was ineffective because he had a conflict of interest and failed to do numerous things: raise a *Brady* violation, object to alleged prosecutorial misconduct, impeach witnesses, investigate or interview witnesses or potential witnesses, call Edwards as a witness, challenge various identifications, and allow Maines to testify.

We presume counsel was effective and a petitioner bears the burden of proving otherwise. *See Commonwealth v. Brown*, 161 A.3d 960, 965 (Pa.Super. 2017). A petitioner may overcome the presumption by pleading

and proving all of the following: "(1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness." **Commonwealth v. Paddy**, 15 A.3d 431, 442 (Pa. 2011). A petitioner's failure to prove any one factor defeats the ineffectiveness claim. **See Commonwealth v. Dennis**, 950 A.2d 945, 954 (Pa. 2008).

The PCRA court denied all of Maines' ineffectiveness claims. The court explained that the fact that defense counsel was allegedly being prosecuted for driving under the influence by the same District Attorney's office as was prosecuting Maines did not create a conflict of interest, and even if it did, Maines had not shown prejudice. **See** PCRA Ct. Op. at 9. The court next concluded that Maines' **Brady** claim was meritless because he "failed to establish that the first two statements are materially exculpatory evidence as he failed to establish either statement contained information that was different from the third statement." **Id.** at 14.

The PCRA court also concluded that counsel was not ineffective for failing to object to the Commonwealth's closing argument because Maines failed to show that he was prejudiced by the Commonwealth's comments. **Id.** at 18, 19-21. It rejected Maines' claim predicated on a failure to impeach witnesses because "[a] review of the trial transcripts shows that [counsel] engaged in vigorous cross-examination of each of these witnesses including highlighting inconsistencies between their statements and their testimony." **Id.** at 21-22. Regarding Maines' claim that counsel was ineffective for not

interviewing witnesses or potential witnesses, the PCRA court found that Maines had failed to show that the actions of counsel were not reasonable. *Id.* at 23. The PCRA court also found that the claim that counsel ought to have challenged witnesses' identification of him in a photo array was meritless because Maines had presented no evidence that counsel had unreasonably concluded that such a motion would not have been successful. *Id.* at 25.

The PCRA court also rejected Maines' claim that counsel was ineffective for failing to challenge the witnesses' identification of Maines' vehicle. The court explained that he had "presented no evidence that had [counsel] followed a different strategy, such as calling an expert witness, the outcome of the trial would have been different," in view of the evidence against Maines. *Id.* at 26. As for Maines' claim that counsel was ineffective for refusing to allow him to testify, the court rejected it based on its factual finding that Maines had agreed with counsel that it was not in his best interest to testify and had therefore decided not to testify. *Id.*

For his final claim, Maines alleges that "[t]he lower court erred by denying relief based on the existence of cumulative error." Maines' Br. at 35. He maintains the cumulative error exists in this case when looking at the alleged prosecutorial misconduct, the alleged *Brady* violations, and his claims of ineffective assistance of counsel. *See id.* Since each of these claims fails for lack of merit or of arguable merit, they do not in combination entitle Maines to relief. *See Commonwealth v. Spotz*, 84 A.3d 294, 321 n.22 (Pa. 2014)

(stating that claims that fail due to lack of merit or arguable merit cannot collectively entitle a petitioner to relief).

After a review of the parties' briefs, the certified record, and the relevant law, we find no abuse of discretion or error in the PCRA court's ruling. We thus affirm the rejection of Maines' prosecutorial misconduct and **Brady** claims, for the reasons set forth above. We affirm the denial of his ineffectiveness claims on the basis of the well-reasoned opinion of the Honorable Norman A. Krumenacker, III, which we adopt and incorporate herein. **See** PCRA Ct. Op. at 6-27.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/17/2020

**IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

|  |  |  |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | * * * * | Nos. CP-11-CR-0774-2013, CP-11-CR-1919-2013 |
| vs. | * * | |
| JASON MAINES, | * * | Defendant's Amended Petition for Post-conviction Collateral Relief |
| Defendant. | * * * | Opinion and Order |

## OPINION

**Krumenacker, P.J.:** Presently before the Court is Jason Maines' (Maines) Amended Petition for Post-conviction Relief (Petition). In his Petition Maines asserts he is eligible for relief based on the trial counsel Arnold Bernard's (Bernard) failure to disclose a conflict of interest pre-trial and for committing six acts of ineffective assistance of counsel.

## PROCEDURAL HISTORY

On October 10, 2014, following a four-day jury trial Maines was convicted as follows:

1) At docket number 0774-2013 one count each of: Criminal Attempt – Possession of a Controlled Substance with Intent to Deliver; Criminal Attempt – Intentional Possession of a Controlled Substance; Terroristic Threats; and Intimidation of Witnesses or Victims.[1]

2) At docket number 1919-2013 one count each of: Criminal Conspiracy –

---

[1] 18 Pa. C.S. §§ 901(a), 901(a), 2706(a)(1), and 4952(a)(1) respectively.

Robbery; Robbery; Burglary; Aggravated Assault – Cause Serious Bodily Injury; Aggravated Assault – Cause Serious Bodily Injury with a Deadly Weapon; and Criminal Trespass.[2]

On December 30, 2014, Maines was sentenced to pay the costs of prosecution, pay restitution of $6,004.31, and serve an aggregate period of incarceration in a state correctional institute of nineteen (19) to forty (40) years incarceration, which is in the standard range. Maines filed Post-sentence Motions and a hearing on them was held May 14, 2015. The Motions were denied on June 1, 2015. Maines filed a timely notice of appeal to our Superior Court asserting that the verdict was against both the weight and the sufficiency of the evidence presented at trial. On June 1, 2016, that court affirmed his conviction and adopted this Court's Rule 1925 opinion as its own. Commonwealth v. Maines, 953 WDA 2015, 2016 WL 3135130 (Pa. Super. 2016) (memorandum opinion).

On November 27, 2017, Craig M. Cooley, Esq. (Cooley) filed Maine's First Petition for PCRA relief asserting that Bernard had been ineffective in failing to disclose a conflict of interest to Maines prior to trial. Specifically, Maines asserted that Bernard was ineffective for failing to disclose that he had been charged with a DUI in Cambria County in July 2014 and that he was being prosecuted in that matter by the Cambria County District Attorney's Office (CCDA). A hearing on the First Petition was held April 24, 2018, and on July 23, 2018, attorney Cooley filed a Motion to Withdraw citing irreconcilable differences that had arisen between him and Maines relative to the issues that should be pursued in the PCRA. A hearing on the Motion was held August 23, 2018, and by order dated August 24, 2018, Cooley was

---

[2] 18 Pa. C.S. §§ 903(a)(1), 3701(a)(1)(i), 3502(a)(1), 2702(a)(1), 2702(a)(4), and 3503(a)(1)(ii) respectively. The Commonwealth pursued a theory of accomplice liability on these charges.

permitted to withdraw and Maines was afforded 120 days to obtain new counsel and amend his PCRA.

On December 19, 2018, Jeremy B. Cooper, Esq. (Cooper) filed Maines' Amended PCRA asserting these claims of ineffectiveness against Bernard:

1) Failure to disclose conflict of interest.

2) Failure to raise Brady violation.

3) Failure to object to prosecutorial misconduct during closing arguments.

4) Failure to impeach various witnesses.

5) Failure to investigate or interview various witnesses or potential witnesses.

6) Failure to call Edwards as a witness.

7) Failure to challenge identification made by witnesses utilizing a photo array.

8) Failure to challenge witnesses' identification of Maines' vehicle.

9) Failure to allow Maines to testify.

A hearing on the Amended Petition was held February 27, 2019, and the parties filed post-hearing briefs.

# FACTUAL SUMMARY

This Court summarized the facts of this case in its August 19, 2015, Rule 1925 Opinion as follows

The testimony and evidence presented at trial revealed that on Saturday February 23, 2013, William Cawthorne (Cawthorne) was at his residence at 720 Highland Avenue in the Moxham section of the City of Johnstown. With Cawthorne were his girlfriend, Kimberly Darr (Darr), Darr's eighteen year old nephew, Barry Black, Jr. (Black), and Cawthorne's two children. At approximately 11 a.m. UPS delivered a package to the residence and Darr, believing it to be a comforter she ordered, opened it. Inside the package and wrapped in various packing materials they found a large plastic bucket that contained a large quantity of what they suspected was marijuana. Darr and

Cawthorne were concerned about taking the drugs to the police because Darr was on probation and they feared she would be charged relative to the drugs. While discussing what to do there was a knock at a side door[3] and Cawthorne answered the door where he encountered a man that he later identified as Maines and another unidentified man.

Maines asked if a package for him had been accidentally delivered to the residence and Cawthorne indicated that no package was delivered. Maines then left. Maines and the man appeared a few seconds later at another entrance and Maines again asked about his package this time offering money for its return. Cawthorne again denied that any package had been delivered and Maines once again left. After Maines left Cawthorne and Darr decided to burn the package and drugs and so Darr took them into the backyard where she was able to burn the packing materials but feared to burn the drugs because someone may smell the marijuana. Maines returned for a third time about twenty minutes later and again asked about his package. He told Cawthorne that if the package was not handed over by Monday Cawthorne would have trouble like he has never seen. Cawthorne again denied that he had the package and Maines once again left.

Following this third visit Cawthorne and Darr became fearful of Maines and decided to turn the drugs over to the Johnstown Police Department (JPD). They, along with Black and the children, drove to the JPD Public Safety Building around 4:20 p.m. Once there they met with officers, gave oral and written statements, and turned over the bucket and marijuana. They requested a patrol car be stationed outside their residence due to their fears, but lack of manpower prevented this[. H]owever[,] officers informed them they would increase the number of patrols in the area. The group then returned to the Highland Avenue residence and shortly after that Darr went to speak with a neighbor to warn them of what happened and ask them to watch for any unusual activity.

At some point during the day Maines called Charles Meyer (Meyer) for help in recovering his package. Meyer was at a casino in Wheeling, West Virginia for the weekend with his girlfriend Bethany Kline (Kline) when he received the call from Maines. Meyer immediately packed, left Wheeling, and returned to Johnstown. He met Maines who was driving a green Subaru that Meyer recognized as belonging to James Schroll (Schroll). Maines drove Meyer to pick up Schroll who was to help recover the package. At some point in the journey Maines handed Meyer a semi-automatic handgun. When Schroll got in the back seat of the car Meyer noticed that he was carrying a revolver.

---

[3] The residence had been converted into three apartments each with a separate entrance and addresses. Cawthorne was in the process of converting it back into a single residence but the three entrances and addresses remained.

Maines then drove to Highland Avenue where he pointed out Cawthorne's residence and informed Meyer and Schroll that was where his package was. Maines then pulled into an alley where Meyer and Schroll got out of the car and walked to the back door of the Cawthorne residence.

Cawthorne heard a knock at the back door and saw two men in hoodies standing there. Fearing that they had come for the drugs he told them he had to get a key for the door and sent Black with the children upstairs with instructions to call 911. While this was occurring Schroll kicked in the back door and entered the residence with Meyer following a few seconds later. Schroll pointed his weapon at Cawthorne and demanded the drugs. Cawthorne lunged at Schroll grabbing for the weapon and a short but vicious struggle for it ensued. During the struggle Meyer pulled his weapon from the waistband of his pants and used it to pistol-whip Cawthorne, ejecting the magazine in the process, and causing Cawthorne to bleed from the head. At some point during the struggle Schroll's revolver discharged with the round going through Cawthorne's left knee and striking Schroll in the head, both collapsed. Meyer heard the shot, saw them go down, fled the residence back to the car where he got in, told Maines that Schroll was shot, and to drive away. Maines then drove Meyer home and the following day he returned Schroll's car to his wife, Lanee Haselrig (Haselrig) and told her he heard about a shooting in Moxham and that she may want to check the hospital for Schroll. Schroll survived his injury but suffered brain damage as a result.

Neither Schroll nor Maines testified but Maines presented two alibi witnesses. Jessica Rickabaugh (Rickabaugh) testified that she lived with Maines, was the mother of two of his children and that on February 23rd he returned home from his job as an auto mechanic around 3 or 3:30 [p.m.] and did not leave the house after that. Rickabaugh testified that she recalls this because they had a birthday dinner that night for their three-year-old daughter. Linda Stephens (Stephens) testified that she is Maines' aunt and that she arrived at his home around 4:50 p.m. on February 23rd for the dinner, left around 6:30 p.m., and that Maines was there the entire evening. By nature of the verdicts the jury did not find the alibi witnesses credible and found Cawthorne's and Meyer's testimony credible as eyewitnesses to these events.

Tr. Ct. Op. 8/19/15 pp. 2-5.

Relative to the testimony of Meyer's the Court noted that

As noted above neither Schroll or Maines testified[,] however[,] the jury heard extensive testimony from Meyer relative to the events that occurred on February 23rd. N.T. 10/7/14 pp. 52-118. Meyer testified that he has known Maines for over twenty years and has known Schroll for some time. Id. pp. 53, 57. Meyer testified that Maines called him while he was in Wheeling, that Maines said his package had been delivered to the wrong house, and he needed

help in recovering the package Id. p. 65-66. Meyer testified that: he immediately left Wheeling; he returned to Johnstown; he met up with Maines, who was driving Schroll's car; he was given a semi-automatic handgun by Maines; they then picked up Schroll; that Schroll had a revolver with him; and that the three drove to Highland Avenue. Id. pp. 65-69, 99-104. Meyer testified that once on Highland Avenue, Maines identified Cawthorne's house as the one his package was at, Maines parked the car in an alley, that he and Schroll then went to the residence while Maines waited in the car, and that Schroll forced his way inside. Id. Meyer explained that once inside he saw Schroll point the revolver at Cawthorne, heard him demand the drugs, that a struggle broke out, that he pistol-whipped Cawthorne, he heard a gunshot, he saw Cawthorne and Schroll go down, he fled back to the car where Maines was waiting, and the two of them drove away. Id. On cross-examination Meyer further testified that it was his understanding that he and Schroll were to get the package back using force if necessary and that Maines giving him the handgun made that very clear. Id. pp. 103-04.

Meyer was subject to intense cross-examination surrounding not only these events but also his prior criminal record, including various convictions for *crimini falsi*, why he initially denied involvement in the crimes, why he did not inform police of the facts until after he was incarcerated for several weeks, and what if any deals he had with the Commonwealth in exchange for his testimony. Id. pp. 83-115.

Tr. Ct. Op. 8/19/15 pp. 8-9.

# DISCUSSION

Our Supreme Court recently has explained a petitioner's burden under the PCRA as follows

Preliminarily, in order to qualify for relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa. C.S. § 9543(a)(2); that his claims have not been previously litigated or waived; and that the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel. Id. § 9543(a)(3), (a)(4).

Additionally, to obtain relief under the PCRA based on a claim of ineffectiveness of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Pennsylvania, we have applied

the Strickland test by requiring a petitioner to establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. Commonwealth v. Pierce, 567 Pa. 186, 786 A.2d 203, 213 (2001). Counsel is presumed to have rendered effective assistance, and, if a claim fails under any required prong of the Strickland test, the court may dismiss the claim on that basis. Commonwealth v. Ali, 608 Pa. 71, 10 A.3d 282, 291 (2010).

Commonwealth v. VanDivner, 644 Pa. 655, 665–66, 178 A.3d 108, 114 (2018). "A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceedings." Commonwealth v. Collins, 598 Pa. 397, 957 A.2d 237, 244 (2008) (citing Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Maines' seven claims of ineffectiveness will be addressed seriatim.

## I.     Failure to disclose conflict of interest.

Maines asserts that Bernard was ineffective for failing to disclose the potential conflict of interest caused by Bernard representing Maines while being prosecuted for DUI by the same district attorney's office that was prosecuting Maines. Bernard testified that: he was arrested for DUI on July 12, 2014; it was his first DUI; based on his experience representing similarly situated clients in Cambria County he expected to be placed into an Accelerated Rehabilitative Disposition (ARD) program; he was placed on ARD; and at no time did his personal situation alter or compromise his trial strategy or representation of Maines. N.T. 4/24/18 pp. 21-27, 30-40. Maines testified that: Bernard never informed him of the DUI prosecution; he learned of it shortly before sentencing through other means; he would have terminated Bernard's representation had he known about the DUI since he felt it created a conflict; he sent a certified letter to Bernard before sentencing terminating him; Bernard

represented him at sentencing; and that he did object to Bernard's representation at that time or inform the Court that he wished to fire Bernard because of the conflict. Id. pp. 5-8, 15-16.

Relative to claims of conflict of interest in the PCRA setting our Supreme Court has explained that

> In Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), the United States Supreme Court held that until a defendant demonstrates that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance of counsel under the Sixth Amendment. Id. at 175, 122 S.Ct. 1237. The Court defined "actual conflict of interest" for Sixth Amendment purposes as a conflict of interest that adversely affects counsel's performance. Id. at 171, 122 S.Ct. 1237.

Commonwealth v. Williams, 602 Pa. 360, 380, 980 A.2d 510, 522 (2009). Mickens requires a two part analysis asking did counsel represent conflicting interests and if so did the conflict adversely affect counsel's performance.

Maines has failed to establish that Bernard's prosecution by the same office created an actual conflict of interest. Bernard testified that he expected to be offered ARD for his first offense consistent with the practice of the CCDA's office and was placed on ARD. He further testified that he did not perceive a conflict in the representation given the circumstances. The resolution of Bernard's case is consistent with the Court's experience in how the CCDA's office handles first time DUI offenses. Maines offered no evidence to counter Bernard's testimony but stated that he would have fired him had he known about the DUI and that he did send a termination letter after learning of the DUI. Maines' testimony on this point is not credible given his further testimony that he permitted Bernard to represent him at sentencing even though he had sent the termination letter prior to sentencing. Had Maines perceived a conflict in Bernard's representation sufficient for him to send a termination letter prior to sentencing it seems reasonable that he would have objected to Bernard's representation on

record at his sentencing hearing or on direct appeal. Maines' actions at his sentencing clearly demonstrate that he did not perceive a conflict of interest at the time and that he was satisfied with Bernard's representation.

Further, accepting *arguendo* that an actual conflict existed, Maines has not presented evidence to show that Bernard's representation was adversely affected by such conflict or directed the Court to any portion of the record demonstrating any compromise in Bernard's representation. Based on the Court's recollection of the trial and a review of the trial transcripts it is clear that Bernard's representation was not hampered by any alleged conflict of interest. Bernard zealously advocated for his client, aggressively cross-examined Commonwealth witnesses, sought to undermine Commonwealth witnesses with inconsistencies in their stories, and presented an alibi defense. Accordingly, there is no merit to this allegation of ineffectiveness. See, Chester v. Comm'r of Pennsylvania Dep't of Corr., 598 Fed. Appx. 94 (3d Cir. 2015) (pending DUI charge against trial counsel, in same jurisdiction in which counsel was representing defendant, did not create an actual conflict of interest, as would violate Sixth Amendment right to conflict-free representation, in absence of showing by defendant that the pending DUI charge caused counsel to change his trial strategy adversely and/or not employ certain methods in his trial strategy that should have been employed, or that alternative strategies were inherently in conflict with counsel's desire to be placed in pretrial probation as first-time offender and thereby avoid imprisonment).

## II.    Failure to raise Brady violation.

Maines asserts that Bernard was ineffective for failing to raise a Brady claim prior to trial when it was discovered that two statements given by Michael Edwards (Edwards) to JPD detective Lawrence Wagner (Wagner) were destroyed. Edwards was a potential

Commonwealth witness who gave a statement implicating Maines in these crimes but recanted that statement approximately seven months later. Edwards was not called to testify by either the Commonwealth or defense and neither his statement nor the fact that he recanted was revealed to the jury.

Wagner testified at the PCRA hearing that: he interviewed Edwards; Edwards implicated Maines in these crimes; Edwards agreed to provide a written statement; Edwards had difficulty writing the statement because of low literacy resulting in many instances of words being crossed out and rewritten; Edwards became frustrated and crumpled up his first attempt; Edwards began writing a second statement but suffered the same problems; Wagner offered to write the statement as Edwards' dictated it; Edwards reviewed the third statement and signed it; both the first and second statements were thrown away in Edward's presence; and that neither statement exonerated Maines. N.T. 2/27/19 pp. 54-55.

Edwards testified that: he initially implicated Maines because he was afraid and confused; he doesn't recall the interview with Wagner because he was on Xanax at the time; he can't recall what he said in any of the three statements; he has low literacy making spelling and writing difficult; and he recanted his statement two or three days after it was made. Id. pp. 74-77.

Bernard testified that: he knew Edwards initially implicated Maines but recanted; knew two statements had been destroyed; knew both implicated Maines; was unsure if the Commonwealth would call him; did not call him as a witness because he did not want the jury to hear the statement as they might credit it more than the recantation and because he wanted to argue that Edwards was the driver the night of the shooting based on DNA in the car; and that he did not raise a Brady challenge because he had no evidence either statement differed

-Page 10 of 28-

from the third or was exculpatory rather than merely potentially useful. Id. pp. 5-8, 30-32, 37-39.

Relative to a defendant's burden of proof in a challenge based on a Brady violation our Supreme Court has explained:

> In Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)], the [Supreme Court of the United States] held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. This Court has held that to prove a Brady violation, the defendant has the burden of demonstrating that: (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant. Prejudice is demonstrated where the evidence suppressed is material to guilt or innocence. Further, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Commonwealth v. Koehler, 36 A.3d 121, 133 (Pa. 2012) (internal quotation marks and citations omitted).

> The Fourteenth Amendment's Due Process Clause

> requires defendants be provided access to certain kinds of evidence prior to trial, so they may "be afforded a meaningful opportunity to present a complete defense." This guarantee of access to evidence requires the prosecution to turn over, if requested, any evidence which is exculpatory and material to guilt or punishment, see Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),] and to turn over exculpatory evidence which might raise a reasonable doubt about a defendant's guilt, even if the defense fails to request it, see United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). If a defendant asserts a Brady or Agurs violation, he is not required to show bad faith.

> There is another category of constitutionally guaranteed access to evidence, which involves evidence that is not materially exculpatory, but is potentially useful, that is destroyed by the state before the defense has an opportunity to examine it. When the state fails to preserve evidence that is "potentially useful," there is no federal due process violation "unless a criminal defendant

-Page 11 of 28-

can show bad faith on the part of the police." Potentially useful evidence is that of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." In evaluating a claim that the Commonwealth's failure to preserve evidence violated a criminal defendant's federal due process rights, a court must first determine whether the missing evidence is materially exculpatory or potentially useful.

Commonwealth v. Williams, 154 A.3d 336, 339 (Pa. Super. 2017) (quoting Commonwealth v. Chamberlain, 612 Pa. 107, 30 A.3d 381, 402 (2011) (some citations omitted)).

It is well settled that materially exculpatory evidence is "evidence which extrinsically tends to establish [a] defendant's innocence of the crimes charged." Commonwealth v. Woodell, 344 Pa. Super. 487, 490, 496 A.2d 1210, 1212 (1985) (internal quotation marks and citation omitted). A claim that a defendant was denied access to exculpatory evidence must be supported; "it cannot be based on a mere assertion." Commonwealth v. Snyder, 599 Pa. 656, 963 A.2d 396, 405 (2009) (internal quotation marks omitted).As our Supreme Court explained in Snyder where a court is faced with a claim that exculpatory evidence has been destroyed

> First, we must determine whether the original samples were "materially exculpatory" or "potentially useful." We recognize this is a "treacherous task," requiring a court to "divin[e] the import of materials whose contents are unknown and, very often, disputed." California v. Trombetta, 467 U.S. 479, 486, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (citation omitted). Accordingly, we have required support for an allegation that destroyed evidence was exculpatory, holding it cannot be based on a "mere assertion." Commonwealth v. Small, 559 Pa. 423, 441–42, 741 A.2d 666, 676 (1999); see also U.S. v. Martinez, 744 F.2d 76, 79–80 (10th Cir.1984) (rejecting a claim of a due process violation where the defendant's assertion that the lost evidence was exculpatory was "based purely on speculation and conjecture").

Snyder, 599 Pa. 656, 672, 963 A.2d 396, 405–06.

In differentiating between these categories the United States Supreme Court has explained that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109–110, 96

S.Ct. 2392, 49 L.Ed.2d 342 (1976). Rather the "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Commonwealth v. Cam Ly, 602 Pa. 268, 294, 980 A.2d 61, 76 (2009) (quoting Kyles v. Whitley, 514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks omitted)). See also, California v. Trombetta, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ("Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense."). In discerning whether evidence is "materially exculpatory" or "potentially useful" our Superior Court has explained that

> Distinguishing between these two types of evidence can be difficult, but such is the federal standard nonetheless. California v. Trombetta, 467 U.S. 479, 486, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); Snyder, 963 A.2d at 405. Evidence is potentially useful, and not materially exculpatory, if no more can be said than that it could have been subjected to tests that might have exonerated the defendant. Arizona v. Youngblood, 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); Snyder, 963 A.2d at 404–06. Establishing that evidence is or would have been materially exculpatory demands more than speculation. Snyder, 963 A.2d at 404–05.

Commonwealth v. Coon, 261 A.3d 1159, 1163 (Pa. Super. 2011). Further, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). See also, Illinois v. Fisher, 540 U.S. 544, 547–48, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004) (*per curiam*); Snyder, 599 Pa. 656, 669–72, 963 A.2d 396, 404–05.

Where merely potentially useful evidence is destroyed before the defense has an opportunity to examine it a defendant must establish bad faith on the part of the

Commonwealth to establish a due process violation. Snyder, 599 Pa. 656, 669–72, 963 A.2d 396, 404–05. In Snyder, the defendants, who had been charged with violations under the Solid Waste Management Act, filed a motion to suppress the results of the tests on the soil sample, which they claimed was destroyed before they could independently test it. Id. The Snyder Court held that in circumstances where the Commonwealth destroys potentially useful evidence before the defendant has an opportunity to examine it, Illinois v. Fisher requires the defendant to show the Commonwealth acted in bad faith in order to establish a due process violation, no matter how central or helpful the evidence may be to the defense or prosecution's case. Snyder, 599 Pa. 656, 669–72, 963 A.2d 396, 404–05. The Snyder Court determined the destroyed evidence was "merely potentially useful," and the trial court erred in suppressing the Commonwealth's test results because the Commonwealth did not destroy the samples in bad faith, even though the prosecution sought to use the samples at trial, the evidence would be central to the prosecution's case, and the disposal was "unnecessary." Id. at 672, 963 A.2d at 396.

Here, Maines has failed to establish that the first two statements are materially exculpatory evidence as he failed to establish either statement contained information that was different from the third statement. Maines merely asserts that the statements *might* have been exculpatory *if* they contained information not contained in the third statement. This is the very definition of evidence that is only potentially useful rather than evidence that is materially exculpatory since it would require further testing, *i.e.* reading, of the statements to determine if they might have exonerated Maines. See, Williams, 154 A.3d 336 (appellee's claim that destroyed surveillance video "may have" something that could be helpful to him at trial (*i.e.*, may show that the identity of the perpetrator was not Appellee) was purely speculative, which

does not establish materiality); Commonwealth v. Spotti, 94 A.3d 367 (Pa. Super. 2014) (*en banc*) (video recording made by officer's vehicle was not material, and thus destruction of recording after 30 days was not a Brady violation in prosecution for DUI, officer testified that recording did not show defendant's vehicle or the accident, no evidence contradicted or otherwise impeached officer's testimony regarding the content of the recording, and there was no evidence that the officer acted in bad faith).

As the statements were only potentially useful evidence Maines must establish that the Commonwealth acted in bad faith in destroying them. Wagner testified that Edwards destroyed the first statement himself by crumpling it up and that Wagner disposed of both statements by placing them in the trash in Edwards' presence. N.T. 2/27/19 pp 54-55. Wagner offered no testimony suggesting that the first two statements contained exculpatory evidence and were destroyed to prevent disclosure of that evidence. Neither did Edwards testify that he included any exculpatory information in those statements. Maines has thus failed to establish that the statements were destroyed in bad faith. Since the statements were merely potentially useful evidence and there was no evidence to suggest they were destroyed in bad faith Bernard cannot be deemed ineffective for failing to raise a Brady challenge as the challenge would have failed.

### III.     Failure to object to prosecutorial misconduct during closing arguments.

Maines next argues that Bernard was ineffective for failing to object to statements made by the assistant district attorney (ADA) in her closing argument. Maines contends it was error for Bernard not to have objected to: (1) statements about Maines' character; (2) use of the biblical quote "the truth shall set you free"; and (3) the ADA vouching for Meyer's truthfulness several times. Bernard testified that: he doesn't usually object during closings

since it can highlight the conduct to the jury; he did not know the quote was biblical in origin since the ADA did not reference scripture when using the quote thus reducing its impact; he did not perceive any instance of improper vouching; the "vouching" was in the form of rebuttal to his argument that Meyer was not credible; the "vouching" consisted of the ADA summarizing evidence and showing it corroborated Meyer's testimony; and that he felt the character statements pushed the boundary but did not object because he did not want the jury to focus on those statements. N.T. 2/27/19 pp. 18-28, 43-44.

Our Supreme Court recently summarized the law surrounding when a prosecutor's remarks in their closing argument arises to misconduct in Commonwealth v. Clancy, ___ Pa.___, 192 A.3d 44 (Pa. 2018). In Clancy the Court outlined a two-part for analyzing a prosecutors comments requiring courts to first conduct a substance analysis to determine if the remark was improper and, if it was, to conduct a prejudice analysis. The Court outlined this two-part test as follows

> The substance prong requires a court to examine the challenged remark in the context of the issues presented at trial. The court first must determine whether the remark reasonably relates to the facts of the case. A statement is impermissible "where the language and inferences of the summation no longer relate back to the evidence on the record." Upon finding that the statement at issue has a reasonable evidentiary foundation, the court next must determine whether the statement facilitates "the trier's duty to decide the case on the evidence." The remark not only must be based upon the evidence; it also must bear relevance to the crimes at issue. Merely derogatory, *ad hominem* characterizations of the defendant or defense counsel are beyond the bounds of permissible advocacy; the prosecutor's comments must be tethered to the elements of the charged offenses and the evidence offered to prove those elements, and also should be tailored to a fair and reasonable rebuttal of the arguments advanced by the defense.

> However, "there is no *per se* rule which requires the grant of a new trial whenever the district attorney acts improperly." If the court determines that the statement was improper, it must then evaluate the effect of the remark pursuant to the unavoidable prejudice test:

> [W]here the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. The language must be such that its unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict. The effect of such remarks depends upon the atmosphere of the trial, and the proper action to be taken is within the discretion of the trial court.

Id. at ___, 192 A.3d at 62–63 (citations omitted).

Maines first argues that Bernard was ineffective for not objecting when the ADA disparaged his character by referring to him as gutless and disgusting for not telling Haselrig that Schroll was in the hospital. N.T. 10/10/14 p. 36, 39, and again by saying the allegations were "disgusting" and "atrocities". Id. pp. 45, 57. The Clancy Court recognized that prosecutors must have some leeway in their closing for oratorical flair but admonished that

> Prosecutorial remarks do not constitute permissible oratorical flair simply because they are based upon the underlying facts of the case *or* because they relate to an underlying element of the crime. Both requirements must be met. To fulfill his duty as an advocate, a prosecutor has numerous tools in his arsenal. Recourse to inappropriate invective is not one of them.

Id. at ___, 192 A.3d at 68. As such prosecutors cannot make reference to a defendant's character, even where the remark is supported by evidence, unless character is related to an element of the offense. In Clancy the Court concluded that the prosecutor's reference to the defendant, who was charged with first degree murder, as "a cold blooded killer" was permissible since it was based on the facts of the case and related to the element of specific intent. Id. at ___, 192 A.3d at 65. Here the ADA's remarks are supported by the facts of the case; however, they do not relate to the element of any of the offenses charged since Maines' post-shooting conduct was not relevant to the offenses charged.

Having concluded these remarks were improper does not warrant a finding of ineffectiveness unless their impact was to unavoidably prejudice the jury. Here the ADA made three remarks related to Maines' character in a lengthy closing argument. When viewing the ADA's closing argument as a whole, in context with Bernard's closing argument, and in consideration of all the evidence presented the Court cannot conclude that the unavoidable effect of the remarks was to prejudice the jury, "forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." See, Commonwealth v. D'Amato, 514 Pa. 471, 526 A.2d 300 (1987). As discussed *supra* the Commonwealth presented significant evidence of Maines' involvement in these offenses including the testimony of Meyer. When viewed in light of the evidence presented these remarks cannot be said to have impaired the jurors' ability to weigh the evidence and render a true verdict. This conclusion is supported by the Superior Court's holding in Maines' direct appeal that the evidence was sufficient to support the jury's verdict. See, Commonwealth v. Maines, 953 WDA 2015, 2016 WL 3135130 (Pa. Super. 2016) (memorandum opinion).

Maines next argues that Bernard was ineffective for not objecting to the ADA's use of the phrase "the truth shall set your free" since it is a reference to scripture. Bernard testified that he did not object to the phrase in part because he did not recognize it was a biblical quotation. The ADA did not reference scripture when utilizing the quote and it was used in response to an argument made by Bernard in his closing that Meyer had bought his freedom through a deal with the Commonwealth by fabricating a story that implicated Maines. In isolation the remark may be viewed as unwise but in context it cannot be deemed improper.

Bernard attacked Meyer's credibility repeatedly in his closing and suggested that he fabricated his version of events to implicate Maines since that is what the Commonwealth wanted and doing so got him a better plea agreement. N.T. 10/10/14 pp. 13-18. During this section of his closing Bernard referenced that Meyer had been placed into a long term drug treatment program rather than remain incarcerated based on his cooperation. Bernard stated

> Essentially what Mr. Meyer is trying to do here is to bargain his way out of prison. What I called this instance in my opening statement was the Commonwealth purchasing Mr. Meyer's testimony through the currency of freedom. And that's what's happening here. Don't be fooled. Don't be fooled by Mr. Meyer. He's getting a lot in exchange for what he's doing.

Id. at 17. In response to Bernard's suggestion that Meyer's was lying in his testimony, the ADA detailed the testimony of other witnesses and other evidence that corroborated Meyer's testimony to show why the jury should find that he was truthful in his testimony. In response to Bernard's suggestion that Meyer's bought his freedom the ADA remarked

> You know his quote, that purchase of freedom through testimony? Maybe the quote he should be using is the truth shall set you free, because regardless of whatever happens in this case, Charles Meyer will do his time. But Charles Meyer is on the road to freedom.

Id. at 41.

When viewed in context there was no basis for an objection to this isolated comment and thus Bernard cannot be ineffective for not objecting. The remark passes the substance prong of the Clancy test, as it was based on the facts presented and was related to the elements of the Commonwealth's ability to establish the elements of the offense through Meyer's testimony. While a prosecutor's remarks must be tempered in their closing, they are permitted to fairly respond to the arguments made by defense in their closing and must be free to rebut assertions made by defense counsel. However, even if the remark was improper under the first

prong, it was not unavoidably prejudicial under the second prong in light of the evidence presented.

Finally, Maines asserts that it was improper for the ADA to vouch for Meyer during her closing argument by telling the jury that Meyer: wasn't lying; was honest; was telling the truth; and was very credible. See, Id. at 43-45. As noted above, in his closing Bernard attempted to undermine Meyer's testimony by suggesting that he had crafted his version of events to match what the Commonwealth wanted him to say. Id. at 13-18. Bernard's specifically called Meyer a liar and told the jury that "he lies," id. at 13, and that the "better he lies, the better interview he gives, and the better testimony he gave on this stand, you better believe that that was all for a better deal for him." Id. at 15. In response to these comments the ADA sought to establish that Meyer was credible by outlining his testimony and the testimony of other witnesses to show that Meyer's testimony was credible and that he was being truthful on the stand. Id. at pp. 38-45. At no time in her closing did the ADA personally vouch for Meyer's veracity or indicate to the jury that she believed him. Rather she, perhaps inartfully at times, sought to show how the evidence and testimony corroborated Meyer's testimony such that the jury should find him credible. Such comments were appropriate in response to Bernard's attempt to frame Meyer as a liar who fabricated his testimony in order to obtain a better deal from the Commonwealth.

Finally, counsel will not be deemed ineffective where there is a reasonable basis for their actions at trial. See, Commonwealth v. Pierce, 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987). In analyzing whether counsel's actions had a reasonable basis "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis."

Commonwealth v. Washington, 592 Pa. 698, 712, 927 A.2d 586, 594 (2007). To sustain a claim of ineffectiveness based on reasonableness, a defendant must prove that the strategy employed by trial counsel "was so unreasonable that no competent lawyer would have chosen that course of conduct." Commonwealth v. Williams, 537 Pa. 1, 640 A.2d 1251, 1265 (1994). A court will conclude that counsel's chosen strategy lacked a reasonable basis only if a defendant proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Commonwealth v. Williams, 587 Pa. 304, 312, 899 A.2d 1060, 1064 (2006) (citation omitted). Trial counsel will not be deemed ineffective for failing to pursue a meritless claim. Commonwealth v. Pursell, 555 Pa. 233, 724 A.2d 293, 304 (1999); Commonwealth v. Rollins, 525 Pa. 335, 580 A.2d 744, 748 (1990).

Bernard testified that it was not his practice to object during the Commonwealth's closing argument unless a comment was patently improper since doing so risked highlighting the comment to the jury and risked offending the jury. N.T. 2/27/19 pp. 18-29, 43-44. Maines has not established that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued" since, had Bernard objected, the objection would have been denied for the reasons detailed *supra*. Indeed, as Bernard noted, had he objected he risked highlighting the comments to the jury and increasing the importance of those sections of the ADA's closing argument.

### IV. Failure to impeach various witnesses.

Maines argues that Bernard was ineffective when he failed to impeach Cawthorne, Darr, and Meyer with their prior statements and actions which were inconsistent with their trial testimony. A careful review of the record reveals that this claim is without merit. A review of the trial transcripts shows that Bernard engaged in vigorous cross-examination of

each of these witnesses including highlighting inconsistencies between their statements and their testimony.

Specifically as to Meyer, Bernard repeatedly sought to undermine his credibility by suggesting that Meyer had molded his statement and testimony to match the Commonwealth's theory of the case in order to obtain a favorable plea agreement and to protect his girlfriend. N.T. 10/7/14 pp. 83-115. See also, N.T. 2/27/19 pp. 9-12, 38-40 (PCRA hearing). Bernard also sought to undermine the Commonwealth's argument that since Meyer and Maines were friends he would have no reason to fabricate his story by eliciting testimony that the two had recently had a falling out to establish an additional motive for Meyer to lie. N.T. 10/7/14 pp. 83-85; N.T. 2/27/19 pp. 9-12.

As to Cawthorne and Darr, Bernard sought to undermine their testimony by pointing out inconsistencies in their statements to police and their trial testimony. N.T. 10/7/14 pp. 162-88 (Cawthorne); N.T. 10/8/14 pp. 117-42 (Darr); N.T. 2/27/19 pp. 12-15, 40-41. In addition he sought to question their actions by bringing out these inconsistencies and suggesting that their actions were not reasonable under the circumstances. Id. Some examples of Bernard's efforts to undermine Cawthorne's credibility include:

1) Noting he originally said he was present when the package was burnt but testified that Darr was alone at the time. N.T. 10/7/14 pp. 172-74.

2) Utilizing the testimony of a Mark Zahrobsky, a UPS employee, to question Cawthorne's timeline by establishing the package was delivered earlier than Cawthorne claimed. N.T. 10/7/14 p. 163, 193; N.T. 2/27/19 pp. 13, 19-22.

3) During cross-examination of Wagner by bringing out inconsistencies in Cawthorne's statement to him that contradicted Cawthorne and Darr's trial testimony. N.T. 10/9/14 pp. 150-51.

Examples of Bernard's efforts to undermine Darr's testimony include:

1) Again pointing out that she originally told police she was alone when the package was burnt contradicting Cawthorne's statement. N.T. 10/8/14 p. 129.

2) Eliciting testimony from JPD Detective Thomas Owens that Darr's father, Barry Black, Sr. (Black), informed police that Darr arrived alone at his house to burn the package. N.T. 10/8/14 pp. 251-52.

A review of all the trial testimony reveals that Maines has failed to establish his claim that Bernard was ineffective in questioning these witnesses.

V. **Failure to investigate or interview various witnesses or potential witnesses.**

Maines next asserts that Bernard was ineffective for not investigating or questioning Edwards, Cawthorne, or Darr before trial. As to Cawthorne and Darr, Maines has failed to present any evidence relative to this issue beyond eliciting from Bernard that he did not interview either of them N.T. 2/27/19 p. 15. Maines did question Bernard as to this strategy and did not present any evidence to show that Bernard's actions were not reasonable or that a different strategy would have resulted in a different outcome. As such his claim fails.

As to Edwards, Bernard was asked if he interviewed Edwards or hired an investigator to interview him and he answered both questions in the negative but was not questioned as to his reasons for not doing so. N.T. 2/27/19 pp. 8-9. Again Maines did not present any evidence to show that Bernard's actions were not reasonable or that a different strategy would have resulted in a different outcome. As such his claim fails.

## VI. Failure to call Edwards as a witnesses.

Maines next asserts that Bernard was ineffective for not calling Edwards as a witness after he recanted his original statement to police implicating Maines. Bernard testified that: he was uncertain if the Commonwealth would call Edwards to place his original statement and recantation before the jury; he did not want the jury to hear Edwards original statement implicating Maines; was concerned the jury would credit the original statement and not the recantation; he intended to argue Edwards was the driver on the night of the shooting based on his DNA in the car; he did not want to give Edwards the opportunity to deny he was driving; and without Edwards' testimony he could call into question why the Commonwealth did not call him as a witness or investigate him when they had his DNA in the car calling into doubt the police investigation. N.T. 2/27/19 pp. 5-8, 37-38

As noted above, in analyzing whether counsel's actions had a reasonable basis "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." Washington, 592 Pa. 698, 712, 927 A.2d 586, 594. Instead a defendant must prove that the strategy employed by trial counsel "was so unreasonable that no competent lawyer would have chosen that course of conduct." Williams, 537 Pa. 1, 29, 640 A.2d 1251, 1265. A court will conclude that counsel's chosen strategy lacked a reasonable basis only if a defendant proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Williams, 587 Pa. 304, 312, 899 A.2d 1060, 1064.

Bernard articulated a reasonable strategy and basis for not calling Edwards as a witness. Further, Edwards testified that: he doesn't recall the interview with Wagner because he was on Xanax at the time; he can't recall what he said in any of the three statements; and

he recanted his statement two or three days after it was made. Id. pp. 74-77. Edwards' testimony establishes that his effectiveness as a witness would be hampered by his inability to remember the details of his interview and statements which could undermine his credibility with the jury. In addition, the Commonwealth notes that the original statement was given on March 4, 2014, the recantation occurred October 6, 2014, the day before trail, rather than the recantation occurring few days later.[4] This discrepancy would have further undercut Edwards' credibility had he testified at trial. Maines has thus failed to establish that calling Edwards as a witness offered a "potential for success substantially greater than the course actually pursued" when Edwards' proffered testimony is considered in concert with all the evidence presented at trial.

### VII. Failure to challenge witness identifications made from a photo array.

Maines next asserts that Bernard was ineffective for not seeking to suppress or challenge the identification made by Cawthorne and Darr of Maines by way of a photo array. Bernard testified that based on his experience a motion to suppress the identifications would have been meritless as there was no indication the array was flawed. N.T. 4/24/18 p. 32. Bernard noted that there were no indicia that the identifications were not credible, such as circumstances surrounding their ability to see Maines clearly in their encounters with him, there were no cross-racial identification concerns, and there was no evidence that the array was unduly suggestive. Id. Maines has presented no evidence to suggest that Bernard's decision was unreasonable in that a motion to suppress would have been successful. Accordingly, this claim fails.

---

[4] There was no testimony presented to establish these dates but it was acknowledged that the recantation occurred the day before trial. N.T. 2/27/19 p. 81.

## VIII. Failure to challenge witnesses' identification of Maines' vehicle.

Maines next asserts that Bernard was ineffective for not adequately challenging the identification of Maines' vehicle by various witnesses. Specifically, Maines argues that at the time of this incident he owned a tan Chevrolet Tahoe and that various witnesses identified a vehicle seen on surveillance video as a Tahoe, Suburban, or Trailblazer. On cross-examination by Bernard, Wagner testified that the Tahoe, Suburban, and Trailblazer were SUVs manufactured by Chevrolet and were similar in appearance. N.T. 10/9/14 p. 146. A review of the trial transcripts reveals that lay witnesses gave alternate names to the vehicle depicted but all testified that it was a tan SUV. Through his cross-examination of Wagner Bernard attempted to undermine the witness identification of the vehicle.

Maines has presented no evidence that had Bernard followed a different strategy, such as calling an expert witness, the outcome of the trial would have been different when all the evidence presented in this case, particularly the testimony of Cawthorne, Darr, and Meyer, is viewed in its totality. As such he failed to establish this claim.

## IX. Failure to allow Maines to testify.

In his final allegation of ineffectiveness, Maines asserts that Bernard refused to allow him to testify in his own defense at trial. As our Supreme Court explained in Commonwealth v. Nieves, 560 Pa. 529, 746 A.2d 1102 (2000):

> The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.

Id. at 1104 (citations omitted). Maines did not raise this issue in either his Petition or Amended Petition but instead raised it for the first time while testifying at the second PCRA hearing.

Maines testified that: he informed Bernard he wanted to testify at trial; Bernard informed him that testifying would not be in his best interest; Bernard informed him that his testifying was not part of his trial strategy; he told Bernard again during trial he wanted to testify; he was never advised by Bernard he had the right to testify; and that ultimately he never was allowed to testify at trial. N.T. 2/27/19 pp. 79, 84-86. Bernard testified that: it was his practice to always discuss with a client their right to testify at trial; in the majority of cases he advised against a client testifying as it can do more harm than good; he recalls a brief conversation with Maines about his right to testify; he advised Maines not to testify as he saw no benefit in it; Maines agreed that testifying was not in his best interest; and that Maines had the right to testify in spite of Bernard's opinion. Id. pp. 91-94. The Court finds Bernard's testimony on this more credible than Maines' eleventh-hour self-serving testimony. See, Commonwealth v. Michaud, 70 A.3d 862, 869 (Pa. Super. 2013). As Maines has failed to demonstrate either that Bernard interfered with his right to testify or gave specific advice so unreasonable as to vitiate Maines' knowing and intelligent decision not to testify on his own behalf there is no merit to this allegation of ineffectiveness.

**Accordingly, the following order is entered:**